UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


                                    )
UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )  Criminal Action
v.                                  )  No. 1:18-cr-10270-RWZ-1
                                    )
ALLAH MALLORY,                      )
                                    )
          Defendant.                )
                                    )


BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT JUDGE


JURY TRIAL
DAY 1


November 4, 2019
9:06 a.m.


John J. Moakley United States Courthouse
Courtroom No. 12
One Courthouse Way
Boston, Massachusetts 02210


Linda Walsh, RPR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way, Room 5205
Boston, Massachusetts 02210
lwalshsteno@gmail.com

APPEARANCES:

On Behalf of the Government:

    UNITED STATES ATTORNEY'S OFFICE
    By: Timothy E. Moran, Esq.
    One Courthouse Way, Suite 9200
    Boston, Massachusetts 02210
    617-748-3100
    timothy.e.moran@usdoj.gov


On Behalf of the Defendant:

    LAW OFFICE OF AUSTIN C. TZENG
    By: Austin C. Tzeng, Esq.
    21 McGrath Highway, Suite 501
    Quincy, Massachusetts 02169
    781-929-4882
    tzengdefense@gmail.com


ALSO PRESENT:  Terry Fahey, Paralegal



                Proceedings reported and produced
                 by computer-aided stenography.

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| TIMOTHY KENNY | | | | |
| By Mr. Moran | 103 | | | |

E X H I B I T S

| DESCRIPTION | RECEIVED |
|---|---|
| GOVERNMENT EXHIBITS | |
| 1.1 Photographs...................................... | 140 |
| 1.2 Photograph....................................... | 140 |
| 1.3 Photograph....................................... | 140 |
| 6 Photograph....................................... | 129 |
| 14 Photograph....................................... | 122 |

| | PAGE |
|---|---|
| Jury Impanelment..................................... | 29 |
| Government Opening Statement By Mr. Moran............... | 92 |
| Defendant Opening Statement By Mr. Tzeng................ | 98 |

P R O C E E D I N G S

(The Jury is not present for the following.)

THE CLERK:  This is *United States versus Allah Mallory*, and it's 18 Criminal 10270.

Could I ask counsel to identify themselves for the record, please.

MR. MORAN:  Good morning, Your Honor.  Tim Moran for the United States.  Also at counsel table is paralegal Terry Fahey of my office.

MR. TZENG:  Good morning, Your Honor.  Austin Tzeng for Mr. Mallory, who is seated next to me.

THE COURT:  These books of exhibits are for this case, right?

MR. MORAN:  Yes, Your Honor.

THE COURT:  Because I have last week's case.

MR. MORAN:  No, that's this case.  There's one for you and the clerk.

THE COURT:  All right.  We likely will get jurors in about half an hour?

THE CLERK:  No.  Maybe 40 minutes or so, Judge.

THE COURT:  Let me review with you what I propose to ask them on voir dire.

I will introduce them to counsel, Mr. Moran and his assistant -- paralegal assistant, Ms. Fahey, Mr. Tzeng on behalf of the defendant, and I'll introduce the defendant as of

Holbrook.

I will tell them that the indictment charges the defendant -- charged that the defendant on July 9th, 2018, in Brockton did knowingly and intentionally distribute a mixture containing a detectible amount of heroin and a mixture containing a detectible amount of cocaine base. I think -- I won't tell them the amount because it's not in the indictment.

And I will tell them that both of these are controlled substances, and it is illegal to distribute them.

I'll ask them whether any of them have feelings about this case that focuses on allegations that the defendant distributed heroin and cocaine base, both of which are controlled substances, and would -- in such a way that it would be difficult for them to be fair jurors.

I will ask them whether they or any members of their families -- defining "family" as children, spouses, siblings, parents, but nobody else -- ever had a problem with or been addicted to any narcotic substance such that they could not be fair jurors in this case.

I will ask them whether they have any views about drug laws, for or against, that would make it difficult for them to be fair.

I will ask them whether any of them are employed by any law enforcement agency, local, state or federal, including Brockton and any -- is it DEA or ATF?

MR. MORAN: This is FBI and a DEA chemist.

THE COURT: Including FBI and DEA, in particular, that would make it difficult to be fair.

MR. TZENG: Judge, on the issue of the -- the question about the drug laws, I think we might be better off leaving that question out because I think that it's perfectly reasonable -- so the Constitution guarantees Mr. Mallory a fair trial, not the Government. So it's perfectly reasonable for jurors to harbor feelings -- negative feelings towards our current drug laws and still be a fair and impartial juror as applies to him.

THE COURT: Well, that would make it difficult for them to be fair is part of the question. But I'm perfectly happy to delete it if you don't want it.

MR. MORAN: No. The question should be asked, Your Honor. The Government is also entitled to a fair trial. And anyone who harbors strong views of drug laws, either too zealous or don't believe in them, that would tend to affect their impartiality or their ability to be impartial, and the question ought to be asked.

Simply a juror indicating a feeling one way or the another does not by itself cause a challenge. It just means --

THE COURT: Feelings is just feelings. Views -- not just feelings, but views about drug laws.

MR. MORAN: I think the question is perfectly

appropriate, Your Honor.

MR. TZENG: I still object, Judge. I think that the Bill of Rights is designed to protect individuals from government power. And in that case, I think it's perfectly reasonable for a juror to sit on this case and have negative feelings towards our current drug laws.

MR. MORAN: Your Honor, perhaps this is the moment to address this point.

In a case like this, nullification may be the only defense. Mr. Tzeng can't raise it, can't argue it, can't put it in his opening, can't put it in his closing. It's very clear that the ethical rules prohibit him from doing that in any fashion, and I think this is the first sailable in that direction. So to be very clear --

THE COURT: I don't think so.

MR. TZENG: I'm going to be arguing credibility, Judge, and legitimacy and authenticity of the evidence that the Government is going to be presenting. I don't intend to -- you know, I've prepared an opening statement with exactly what Mr. Moran has said in mine and avoiding the issue, to the extent that I can, regarding jury nullification. That's not the basis of the defense.

THE COURT: I will think about it. But I think it is a proper question because people do have strong views, and strong views about the law that governs the case should

probably be ferreted out if it's going to affect their decision about the case rather than the facts of the case.  That's all. So that's why I put the question in here.

MR. TZENG:  Just note my objection, Judge.

THE COURT:  Noted.

I will ask them whether any of them or members of their immediate families, as previously defined, are employed by any law enforcement agency, again, local, state, or federal; whether any of them have had any experience with any law enforcement personnel that would affect their ability to be fair and impartial.

I will explain to them that law enforcement are no more or no less -- neither more nor less credible than any ordinary witnesses.

I will explain to them the presumption of innocence and what that means, that the defendant is innocent, that the defendant has to produce no evidence, that he does not have to explain himself, take the stand.  He can say to the Government "You've accused me.  Now you prove it."

I will ask them about the schedule, and if there's anything else.

I don't know if I left out -- I do intend to ask them whether any member of the jury or member of their family ever had a problem with or been addicted to any narcotic substance.

Those are, in essence, the questions I propose to ask.

Any suggestions of errors or omissions?

MR. MORAN:  Your Honor, I might ask if anyone has ever had a claim against or lawsuit against the United States or any of its agencies.

THE COURT:  Why is that relevant?

MR. MORAN:  Well, I think it might show bias against the Government.  We are one of the parties in the case.

And the other thing I would -- I'd like to request a CSI-type instruction, that they -- that if they watch forensic television programs like CSI, whether they can put that aside and base their determination solely on what they hear in this case.

THE COURT:  Your first question was about claims against the Government.  What do you think about that?

MR. MORAN:  Yes.

MR. TZENG:  I don't think it's relevant.  I mean, like I said before, I think it's perfectly --

THE COURT:  I mean, it's a criminal case.

MR. MORAN:  It is, Your Honor.

THE COURT:  Nothing to do with a claim against the Government.

MR. MORAN:  Well, the Government is the plaintiff here and --

THE COURT:  I know you are plaintiff.

MR. MORAN:  That's why it's relevant, because if the

person or any -- what if a family member has --

THE COURT: You think somebody who had a tax dispute or something like that is likely to be swayed by that in a drug case?

MR. MORAN: I don't know, Your Honor, but I think it's something that's worth checking.

THE COURT: I'll think about that one, too.

MR. TZENG: I think it's perfectly legitimate for reasonable jurors to harbor a bias against the Government and still be able to sit as a fair and impartial juror as it applies --

THE COURT: So you don't object to the question?

MR. TZENG: I do object to the question because I don't think it should be asked.

THE COURT: Well, we don't want to have jurors who admit that they have a bias against the Government. And I include that in all of the questions that go to their attitude toward the Government because it's appropriate.

MR. TZENG: I would like those jurors.

THE COURT: I'm not going to take it out. I mean, if somebody has a feeling about the drug laws and therefore would have a bias against any drug case, or in the other direction, I think we're entitled to know that. And you are entitled to strike that juror for cause -- maybe for cause or at least, you know, when it's your turn to delete any of them.

MR. TZENG: I'll be raising that objection if it comes up with any of the jurors.

Also, Judge, to the extent that we might be asking questions of the jurors up at the sidebar, I'd ask that the Court ask the question about the defendant not testifying at that point in time as well. It's been my experience that when that question is asked of the jurors as a group, it's infrequent that people will raise their cards and say "Yes, I have a bias against the defendant."

I think it's a nuanced question that they may not have time to immediately process, but in my experience, when that question is asked individually of the prospective jurors, a surprising number of them answer affirmatively.

THE COURT: How would you -- how would you phrase the question? Because at that point is it clear that he will not?

MR. TZENG: I don't know. I haven't seen the Government's case yet. But the way that it's been typically asked in my experience is, "A defendant in a criminal case has an absolute right not to testify. In this case, if the defendant chose not to testify, would you hold that against him in any way?" And then there are lots of people who at that point in time say, "Well, you know, I would like to hear something from the defendant." But a surprising number of them don't actually raise their cards when it's asked of them as a group.

THE COURT: Any objection to that?

MR. MORAN: I think I would see how the questioning is going, Your Honor. If we're asking, say, about a family experience with heroin use, it would seem an odd moment to interject the question about the defendant not testifying. It almost draws too much attention to it or acts as if it's the single most important potential source of bias.

THE COURT: If I remember. You know, you can also ask it if I don't remember.

MR. TZENG: Okay. Thank you, Judge.

MR. MORAN: Your Honor, is it your practice to allow the attorneys to question?

THE COURT: I usually do. They usually don't have a whole lot of questions, which is fine.

MR. MORAN: Okay.

THE COURT: But I ask them the specific question with respect to which they answer during the general voir dire, and then turn to counsel and ask counsel whether they have any questions. But I don't want each of these interviews to turn into a half-hour questioning.

Okay. And then in the end I will ask them whether there's anything else that I haven't specifically asked about that would cause any juror to feel that they might not be fair jurors or that they cannot serve.

That's it.

MR. MORAN: Oh, Your Honor, I had asked about a CSI instruction or question.

THE COURT: This is based on your experience?

MR. MORAN: Yes. I think jurors who watch a lot of police procedurals on TV expect --

THE COURT: What does "CSI" stand for?

MR. MORAN: Crime Scene Investigation. I don't watch the show myself. It's one of those television programs where the detective picks up a thread and then 20 seconds later they are able to say, oh, this came from such and such and that's why we know everything. I think they tend to place undue expectations on jurors.

THE COURT: Do you have objection to it?

MR. TZENG: I certainly do, Judge. I think whatever jurors' expectations are -- you know, one way or another, could be, you know, like I said, potential bias against the Government, what they might expect to see in a criminal case. I mean, the Government has to prove it beyond a reasonable doubt. So whatever their view of "beyond a reasonable doubt" is, I think should hold.

MR. MORAN: Well, that's exactly --

THE COURT: That's not what he's talking about. It is the case that -- I mean, I sort have gotten into the habit of explaining to jurors in the charge, in the end, about, when I talk about circumstantial evidence, how Perry Mason used to say

that it was just circumstantial evidence as if it was absolutely no good.  Of course, nobody here remembers Perry Mason because it was so long ago, and most of the jurors don't either.  But, you know, it's a fact that a lot of people used to watch the show, a lot of people came away from the show with a view that circumstantial evidence is no good.  So I can stop doing that.  But I think the question about a television show that is apparently fairly widely watched that deals with evidence in a way very different from the way a court does is not inappropriate.

MR. TZENG:  I object.

MR. MORAN:  I think it's appropriate, Your Honor.  I think the point is --

THE COURT:  He objects, but I said I would do it.

MR. MORAN:  Thank you, Your Honor.

THE COURT:  Anything that you would like me to ask that I haven't?

MR. TZENG:  I don't think so, Judge.

THE COURT:  Okay.  So that takes care of that.

MR. TZENG:  I filed some motions -- one second.

(Attorney Tzeng and defendant confer.)

THE COURT:  Yes.  There is one ex parte motion which I will allow.  It is Docket Number 76.  Lisa, I've allowed it.

MR. TZENG:  I'm sorry, Judge?

THE COURT:  Docket Number 76 I have allowed, an ex

parte motion --

MR. TZENG: Thank you, Judge.

THE COURT: -- having to do with funds.

MR. TZENG: Thank you.

THE COURT: And then there is the defendant's motion pertaining to the identification of the -- the identification of the defendant in a video?

MR. TZENG: That's correct.

THE COURT: And, also, with respect to messages?

MR. TZENG: That's correct.

THE COURT: I think with respect -- well, I'll hear you.

MR. TZENG: Sure. I think that it's up to the jurors to decide whether or not the person depicted on the video is in fact Mr. Mallory. That's the first half of the motion.

And then, secondly, the text messages sort of presume that the target of the investigation is in fact Mr. Mallory. I don't think that the text messages need come in. If there's testimony from the CW with the agent that they were texting before to arrange a date, a place and time to meet, that's fine. But it should not say that the target is Allah, and that's what I have a problem with with respect to the text messages.

With respect to the video identification, Mr. Mallory is here. The jurors are going to see the video. They should

be the ones to decide whether or not he is in fact the person who was on the video. I don't see how law enforcement testimony about their familiarity with Mr. Mallory should come in.

It's prejudicial against him, first of all. And secondly, in the case law that I've cited, it indicates -- it doesn't help them in any way, in other words. It doesn't assist them. I don't actually know --

THE COURT: When you say "them," you mean the jury?

MR. TZENG: The jurors, that's correct, Judge.

It doesn't assist the jurors in any way. They're perfectly -- you know, in a perfect position to be able to see whether or not this guy is that guy, and that's what they have to determine beyond a reasonable doubt.

MR. MORAN: Your Honor, it would assist the jurors. And the Government will lay the proper foundation for doing that. The video itself is quick. The chunk that we're going to play is about three minutes long, but it's a handheld recorder. So like other consensual recordings that you have no doubt seen, it moves around, it jumps. There's only a few quick glimpses of Mr. Mallory. We've excerpted still shots of the best of those, but the fact is, they're quick and fleeting and --

THE COURT: The jury -- if it comes to the evidence, the jury will have it with them in the jury room when they

deliberate.

MR. MORAN: They will. But when they're in the jury room, they won't have Mr. Mallory. And the other thing is that --

THE COURT: They will have seen him for days.

MR. MORAN: You can hear him on the video during the Government's case in chief. They will not have the opportunity to hear Mr. Mallory. And so the witness who is familiar -- that's the key distinction between this case and the cases cited --

THE COURT: I don't understand. The video itself includes Mr. Mallory speaking?

MR. MORAN: Yes.

THE COURT: And that the jury will be able to hear in the jury room but not in the courtroom?

MR. MORAN: The jury will be able to hear the video, but they will have no -- the point is, they can look at Mr. Mallory. They can't hear Mr. Mallory speaking because, at least during the Government's case in chief, because he has an absolute right -- we are not going to call him to speak, so the identification will be based on the witness's long familiarity with his appearance and his voice. So that's a familiarity that the jury will not have.

THE COURT: So the jury -- the identification by the Brockton police officer will rely both on his long-term

knowledge of Mr. Mallory and his understanding of Mr. Mallory's speech?

MR. MORAN: Yes.

MR. TZENG: During what --

THE COURT: And the jury is not going to hear the speech even?

MR. MORAN: Well, no. The jury will hear -- what I mean is the jury will hear the audio that's attached to the video, but they have nothing to compare it to. They've never heard him speak, and they're unlikely to hear him speak at the trial. Certainly they won't hear him speak during the Government's case in chief. So they have no basis on which to make a comparison. That's what the cases say. That's a distinction between the cases cited by Mr. Tzeng and what we're citing in our brief opposition.

The point is -- the jury will also only have seen Mr. Mallory over the course of a few hours today and tomorrow and perhaps Wednesday. The witness has a long-term familiarity with him, which makes the witness's identification useful and helpful to the jury. And what we're talking about doing, Your Honor, is playing the video again, once during the trial, and having him say, "You know Mr. Mallory." "You have known him for ten years" or however long. "Have you heard him speak?" "Do you recognize the person who appears and speaks on that video?" It's a pretty quick piece of testimony.

It is not overview testimony because the witness, in fact -- we went and picked somebody who was not involved in this investigation so as not to run the risk of any undue or improper overview testimony.

THE COURT: But I thought he was involved in the investigation.

MR. MORAN: No. Detective Graham investigated him in the 2016 Plymouth Superior Court case. So he knows him, but he doesn't have anything to do with the FBI case. I think that's actually a safer course.

THE COURT: Mr. Tzeng?

MR. TZENG: Judge, as brief as the testimony and the evidence might be, it's still largely damaging and unduly prejudicial to Mr. Mallory. I mean, the tape is short. It appears to be, you know, what I've said before. It's the hallmark of the Government's case. And so for a law enforcement witness to say this guy is that guy just -- it's improper.

What the Government is asking the Court to do is make a ruling that has time and time again constituted reversible error in the cases that I've cited here. There's no reason for an officer's lay opinion about whose voice that is in the recording. He shouldn't be able to say that it's him. It's for the jury to decide. And if the jury doesn't have a voice exemplar, then tough noogies. I mean, that's tough for the

Government.

And I don't think that permitting them to put on a decorated law enforcement witness who has years of experience -- supposedly has years of experience with Mr. Mallory should come in. It's prejudicial against Mr. Mallory and tramples on the provenance of the jury.

THE COURT: You want the detective also to talk about the voice?

MR. MORAN: I will say, "How do you recognize him?" Your Honor, I think it's fair to do it that way. It's not at all improper under the cases. It would be improper if I just called a witness, even law enforcement, to say, "You see the video?" "Do you see the person in the room?" It's different than that, Your Honor.

It's "Do you have a personal familiarity with Mr. Mallory?" That's what's helpful to the jury because they only get to see him briefly.

THE COURT: How does this video come into evidence?

MR. MORAN: It will be authenticated both by the special agent who operated the recorders, and the cooperating witness will testify who was included in the video.

THE COURT: Why can't he identify who he dealt with, not on the video but just who he dealt with?

MR. MORAN: The proper witness will. But Mr. Tzeng, his lawyer, is prepared to impeach his credibility. I think

I'm allowed to rehabilitate my --

THE COURT: You can argue he told us this was Mr. Mallory he dealt with and look at the video.

MR. MORAN: Your Honor, I'm entitled to put in more evidence. I'm entitled to put in an identification. I don't intend to have the case agent identify the video because I think he lacks that personal familiarity.

MR. TZENG: For what it's worth, Judge, Mr. Mallory has indicated that other than during the trial in 2016, he's never had any interaction with this particular officer. So I fail to see the relevance of it.

THE COURT: What about the messages; are you agreed that they go out?

MR. MORAN: I think they are proper, Your Honor. I mean, they will be adopted by the witness.

THE COURT: Which one? The agent?

MR. MORAN: The agent and the cooperating witness. So each one will adopt his own portions of them.

THE COURT: What else do we need? Why do we need to have the detective tell us about them?

MR. MORAN: The detective won't testify -- I think Mr. Tzeng just put two different objections in the same motion. I don't think they're related, Your Honor, aside from the fact that they both get to -- they are both part of our piece of evidence.

THE COURT: Why would the identification not be hearsay?

MR. MORAN: Identification by definition is nonhearsay.

THE COURT: Except here it's the speech that is being identified.

MR. MORAN: We're back to the video, Your Honor. It's not hearsay under Rule 801, I believe it's (d)(1)(C), statements offered to identify by definition are not hearsay. But we're not -- when the detective testifies has nothing to do with any particular -- contrary particular statements. He can say that he's heard Allah Mallory speak. He's spoken to him.

THE DEFENDANT: He never heard me speak. I never had any interaction --

THE COURT: Mr. Mallory, please let Mr. Tzeng speak for you. You're going to get into trouble -- I mean, not from me but from the jurors -- if you interrupt. So please don't do it. It's just not good for you to do that. I know it's hard to sit there and to listen to all of this.

THE DEFENDANT: Lies.

THE COURT: But just try to contain yourself, please.

MR. MORAN: Your Honor, I should add here -- and I do want to put this on the record, just so Your Honor is aware of it -- at the last trial in Plymouth in September, towards the end of trial Mr. Mallory did have an outburst where I

understand he directed comments right at a juror. And I think, you know, I want her Honor to be aware of it.

THE COURT: What do you want me to do about it?

MR. MORAN: Nothing. I want you to be aware of it in case it happens in this case. I'll be asking you to do something about it. I want you to be aware it happened in the past. Your Honor's advice to him is well taken.

Back to the identification, I think it's completely proper to have someone familiar with his appearance to identify a video. It's done routinely in consensual video cases. There's -- the cases do not say that it's inappropriate where the defendant -- where the witness has a familiarity independent of the case.

MR. TZENG: Judge, then get it through CW-1. I don't understand. Why does the Government then get to put on another law enforcement witness to thereby bolster CW-1's credibility? It shouldn't happen.

MR. MORAN: Your Honor, that's exactly my job.

THE COURT: Hold it. I'm going to think about it. And we'll take a brief recess.

I really worry, Mr. Mallory, about your not being able to sit still. It's hard to do. I know that. If at any time you feel stressed, let Mr. Tzeng know, and we'll take a recess. Okay? Because if, in fact, something goes wrong in the trial, then we just have to do it over again, and that's no fun.

MR. MORAN: Your Honor, I think we should put on the record, Mr. Tzeng filed a motion to admit prior criminal conduct regarding the cooperator.

MR. TZENG: Judge, before we --

THE COURT: I haven't seen that motion.

MR. TZENG: It's the reverse 404(b) motion, Judge. Before we get there, has the Court made a ruling regarding the text message communications?

THE COURT: I think that comes out.

MR. TZENG: Okay. Thank you.

THE COURT: It's the person identification that I'm concerned about.

MR. MORAN: Your Honor, ID is nonhearsay. It's always nonhearsay. It's not being offered for the truth. It's being offered for identification.

THE COURT: I understand that's your position.

MR. TZENG: The text messages --

THE COURT: I think I just ruled in your favor.

MR. TZENG: Thank you, Judge.

THE CLERK: Do you have that?

THE COURT: That one I haven't seen. What number is it?

THE CLERK: I don't know.

MR. TZENG: Judge, it's because I think I misfiled it as a pretrial memorandum instead of a motion in limine. That

was my fault.

THE COURT: I haven't seen that either.

MR. TZENG: I figured it out, how to do it properly.

THE COURT: It's okay. But this is now a redone motion -- as a motion rather than pretrial memo or what?

MR. TZENG: This should be a motion in limine. I miscaptioned it, Judge, when I filed it.

THE COURT: Okay. This says "Motion to" -- "Motion, Notice to Impeach Government Witness."

MR. TZENG: Right. So it's both. It's notice to the Government under 404(b) for impeachment of evidence as well as arguments as to why I should be able to get into those specific instances of misconduct by CW-1.

THE COURT: So that one I have to look at. I haven't seen it.

MR. MORAN: Your Honor, I think we have an agreement. Mr. Mallard and I spoke. Mr. Tzeng and I spoke about this. I intend to ask the cooperating witness about prior convictions, including ones that were overturned either on appeal or one was suppressed. So I think he will get the facts of those convictions. I don't think he can go into detail about the underlying conduct.

Under 608(b) you get the fact of the conviction. You don't get the details. So I don't think -- and you certainly don't get the documents.

THE COURT: I haven't read this so I'm not sure what he's asking. So I would sort of like to read it and then listen to both of you.

MR. MORAN: I thought we had an agreement -- I thought we were just putting on the record an agreement that he and I had reached about how to handle this.

THE COURT: Okay. All the better.

MR. TZENG: I think the agreement was regarding the admissibility of certain documents that I probably don't get into -- get to introduce the prior certified convictions, but my argument remains the same, that I should be able to get into specific acts of misconduct under 404(b), and that's why I filed this motion.

THE COURT: Of the confidential witness?

MR. TZENG: Yes. CW-1 has a long history of disguising, altering, subverting, concealing illegal evidence, evidence of his own illegal activity from the Government. There was a -- what I talked about is in one of the cases that he was convicted of. He tried to flush drugs when chased after by -- he was seen flushing drugs.

THE COURT: Excuse me. Would it not be easier if you allow me to read this?

MR. TZENG: Yes. Sorry, Judge.

THE COURT: Thank you.

MR. TZENG: While we're here, Mr. Mallory -- the

Government has introduced or given me a copy of its exhibit book. Mr. Mallory has been going through this diligently while I've been arguing. I have two points of objections to the exhibits. One is Exhibit 8.3, which appears to be a still photograph from a video that was in the CW-1's car. What it does is it shows Mr. Mallory's GPS device around his ankle.

I don't know if the Court has made a ruling on the admissibility of the GPS evidence yet, but to the extent that -- to the extent that the Court would consider keeping that information out, I would object to the Government using this particular photograph.

The other, Judge, is Exhibit 17, which are documents related to Mr. Mallory's being ordered to wear a GPS bracelet. It indicates that -- there's a portion in there where it indicates --

THE COURT: The Government -- I gather the Government is using it not to show that he had such a device, other than to -- as the basis for how they knew where he was.

MR. TZENG: Well, nevertheless, Judge, there's one of the documents in here --

THE COURT: Maybe you can agree that they properly got there, except you have some other --

MR. TZENG: I don't know -- I mean, Judge, it's hard for me to interpret the evidence without an expert, first of all. So I'm not sure I can competently argue in terms of

admissibility.  Nevertheless, one of the documents that's ordering Mr. Mallory on release, it says, "If he makes $250,000 cash bail to be placed on GPS," that should be taken out.

THE COURT:  Well, have you talked to each other about this?

MR. TZENG:  I just noticed it, Judge.

THE COURT:  All right.

MR. MORAN:  I'm happy to talk to him about which of those documents would come into evidence.  I've offered to stipulate to the fact that there was GPS monitoring in some way, but he refuses to stipulate to anything, so I have to prove it the hard way.

THE COURT:  Okay.

MR. MORAN:  So I can certainly work with him which of those documents are necessary.

THE COURT:  I would appreciate to be able to read the stuff you gave me late.  I understand why.  But I need to read it.  So we'll do that.

Is the jury coming up yet?

THE CLERK:  Yes.

THE COURT:  They are?

THE CLERK:  Yes.

THE COURT:  You mean they are en route?

THE CLERK:  Yes.

THE COURT:  So we'll take a two-minute recess.

THE CLERK: All rise, please.

(Recess taken at 9:40 to 9:48 a.m.)

(Potential jurors enter the courtroom.)

JURY IMPANELMENT

THE COURT: Good morning, Members of the Jury.

I am Judge Zobel, and I will preside over this trial, which is a criminal case. In order for us to be sure that we have as fair a jury as possible, I will ask you some questions. And I ask that you please raise your hand and keep it up until I can make a note of the fact that the answer is yes. If the answer is no, then you can just please sit quietly.

And once we finish these questions, which will not take terribly long, that is the en masse questions, I will talk with those of you who answered yes to any of the questions over here in the presence of counsel and the defendant, and then ultimately we will have a jury, hopefully very quickly. So I appreciate your cooperation.

First, let me introduce those -- the participants in the trial other than the judge. In a criminal case, it is always the United States that originates the case by means of an indictment. That is, it presents evidence to a grand jury, a body of 23, I think, who do not decide anything about the guilt or innocence of the defendant. They simply decide whether only the Government's evidence is sufficient to cause that jury to accuse the defendant. And then an accusation is

put on paper, and that's called an indictment.  So that is the beginning of the case.

The Government is represented in this case by Mr. Timothy Moran, an Assistant United States Attorney, who is assisted by his paralegal, Ms. Fahey.

The defendant is Mr. Allah Mallory of Holbrook, and he is represented by Mr. Austin Tzeng, who practices in Quincy.

Do any of you know either of the representatives of the United States or the defendant or his counsel?

Okay.  Hang on.  For some reason when I try to find the original pages, they always get stuck together.

Mr. Brinkman?

THE JUROR:  Yes, Your Honor.

THE COURT:  Whom do you know?

THE JUROR:  I know defense counsel.

THE COURT:  Okay.

THE CLERK:  So Juror Number 31.

And then there's a woman right here (indicating).

THE COURT:  Anybody else?

THE CLERK:  Malone.

THE COURT:  Ms. Malone?

THE JUROR:  Yes.

THE CLERK:  36.

THE COURT:  Do you know Mr. Tzeng, too?

THE JUROR:  I know the defendant.

THE COURT: You know the defendant?

THE JUROR: Yes.

THE CLERK: Juror Number 36.

THE COURT: Okay. Anybody else?

Mr. Wood?

THE JUROR: Yes. I've seen the defense attorney in Quincy before.

THE COURT: But you don't know him personally?

THE JUROR: No.

THE COURT: Anybody else?

(No response.)

THE COURT: All right. Now, the indictment which, as I said, is the accusation in the case, says, in substance, that the defendant on July 9th, 2018, in Brockton did knowingly and intentionally distribute a mixture containing a detectible amount of heroin and a mixture containing a detectible amount of cocaine base, both of which are controlled substances. That's the accusation. He is accused of having possessed and distributed these quantities of heroin and cocaine.

Does anybody know anything at all about the underlying facts of this case?

Yes. Ms. Malone.

THE CLERK: Okay. 36.

THE COURT: I think we can probably agree that we need to excuse Ms. Malone, and perhaps she can just return to the

jury room.

THE CLERK: Okay, Judge.

I just need to give you your card, please. One second. Sorry. So Juror Number 36.

THE COURT: So if you'd just go back downstairs. We'll see if we can find another case for you in which you're totally anonymous.

Do any of you have any feelings about this case that thus focus on allegations that the defendant distributed heroin and cocaine base, both of which are controlled substances, that would in any way make it difficult for you to be a fair juror?

Ms. Szendey.

THE JUROR: Szendey.

THE CLERK: That's Juror No. 10, Judge.

Juror Number 6 is, also.

THE COURT: Wait a minute. I need to... Number 6 --

THE CLERK: Yes.

THE COURT: -- is Mr. Osterberg.

THE CLERK: Yes.

And then we've got --

THE COURT: Anybody else in the jury box?

(No response.)

THE COURT: First row?

THE CLERK: Juror Number 20.

THE COURT: Ms. Tozier.

THE CLERK: Yes.

THE COURT: Anybody else in the first row?

THE CLERK: And then Juror Number 22, Judge.

THE COURT: 22?

THE CLERK: Yes. Ms. Cullen.

THE COURT: Oh, okay.

And Mr. Susienka.

THE CLERK: Yes. Juror Number 25.

THE COURT: And, also, Ms. Sternburg.

THE CLERK: Yes. 28.

THE COURT: And Mister --

THE CLERK: And then we go two rows down.

THE COURT: You're in the third row, right?

Mokoid, is that how you pronounce it?

THE JUROR: Yes.

THE CLERK: Mr. Mokoid is 41.

THE COURT: And Mr. Blake, is it?

THE JUROR: No. It's Dubord.

THE CLERK: What is it?

THE JUROR: Dubord.

THE CLERK: I'm sorry. James, Juror No. 33, Judge.

THE COURT: Okay. Anybody else in the second row?

(No response.)

THE COURT: Okay. Have any of you had -- or members of your immediate families, spouses, children, siblings,

parents, and that's where we cut off.  So have any of you or members of your immediate families ever had a problem with or been addicted to any narcotic drug that would make it -- which events or activities would make it difficult for you to be a fair juror in this case?

Okay.  So let me start again in the jury box with Mr. Osterberg.

THE CLERK:  Yes.  Juror Number 6.

THE COURT:  Anybody else in the jury box?

(No response.)

THE COURT:  First row?

THE CLERK:  Juror Numbers 19 and 20, Judge.

THE COURT:  So Ms. Stubblefield and Ms. Tozier.

THE CLERK:  And Tozier, yes.

THE COURT:  Further down.  Anybody else in the first -- okay.  Ms. Sternburg.

THE CLERK:  28.

THE COURT:  Did I miss anybody in the middle of the first row?

(No response.)

THE COURT:  Second row, anybody in the second row?  We come to Mister --

THE CLERK:  Mr. James, Juror Number 40, Judge.

THE COURT:  Mr. James, right?

THE CLERK:  Yes.  And then we have 42, Mr. Matthews.

THE COURT: And Mr. Matthews.

THE CLERK: Yes.

THE COURT: Did I miss anybody?

(No response.)

THE COURT: Do any of you have any views about the drug laws, either for or against, the way they exist nowadays that would make it difficult to be a fair juror?

Ms. Szendey.

THE JUROR: Szendey.

THE COURT: Szendey, sorry.

THE JUROR: It's okay.

THE CLERK: Szendey, that's 10.

We have Juror Number 3, also, Judge, in the first row.

THE COURT: And Mr. Mendoza-Vivas.

THE CLERK: Yes.

THE COURT: Is that it in the jury box?

(No response.)

THE COURT: First row?

Mr. Susienka.

Anybody else in the first row?

(No response.)

THE COURT: And then in the second row? Mr. Dubord.

THE CLERK: Yes. Mr. Dubord is 33.

THE COURT: Anybody else in the second row?

(No response.)

THE COURT: And then Mister --

THE CLERK: 41, Mokoid, yes.

THE COURT: -- Mokoid.

Okay. We're changing the subject.

Are any of you employed by any law enforcement agency, local, state or federal, or your immediate family so employed?

THE COURT: Mr. Wood I know.

THE CLERK: 2.

6.

THE COURT: Mr. Osterberg.

THE CLERK: Yes.

THE COURT: Anybody else in the jury box?

(No response.)

THE COURT: And then in the back, Ms. Sanders.

THE CLERK: Yes, 18.

20.

THE COURT: And Ms. Tozier, sorry.

THE CLERK: Yes.

THE COURT: In the middle, anybody?

(No response.)

THE CLERK: No.

THE COURT: No.

And then we come back again to Mr. James.

THE JUROR: Yes.

THE CLERK: Number 40.

THE COURT: Did I miss anybody?

THE CLERK: Oh, wait a minute. I'm sorry.

THE COURT: Oh, let's see.

THE CLERK: Ms. Carter? Yeah, Juror Number 37, Judge.

THE COURT: Okay.

Have any of you had any experience in your everyday lives with somebody who works for law enforcement that would affect your ability to be a fair juror; that is, did you have either a particularly pleasant experience or a particularly unpleasant experience that would make it difficult for you to be a fair juror in a case that has a fair number of law enforcement personnel testifying?

Nobody in the jury box.

THE CLERK: Yes.

THE COURT: Oh, yes. Mr. Osterberg.

THE CLERK: Juror Number 20.

THE COURT: Ms. Tozier.

THE CLERK: Yes. 22, Ms. Cullen.

THE COURT: And Mr. Susienka.

THE CLERK: 25. Yes.

THE COURT: Anybody else?

(No response.)

THE COURT: Now, let me explain to you something about law enforcement. As I mentioned a moment ago, there will be a number of -- I suspect both local and federal agents

testifying, local police that are assigned to task forces or the like. And when you -- one of the jobs that a jury has -- the main job that a jury has, apart from listening to the evidence, is ultimately in reaching your verdict to decide whether you believe what any of the witnesses tell you. One of the things that I want you to be aware of is that law enforcement personnel are neither more nor less believable than anybody else.

Excuse me. Could you please move over to the other side of the courtroom. Thank you.

So law enforcement, an agent of FBI or DEA or a local police officer is no more credible than an ordinary mortal, nor less credible than an ordinary mortal.

Does anybody have a serious problem accepting that principle of law?

(No response.)

THE COURT: Good.

Along the same lines, a defendant who -- same lines because, again, I now speak about principles. This time constitutional principles. The Constitution says that the Government may accuse a person of a crime but that the person is presumed to be innocent, which really means that the person accused is innocent until the Government proves him guilty beyond a reasonable doubt. And that will be the determination of this jury after you have heard the evidence, after you have

heard the instructions on the law. You will then have to decide whether the defendant is -- has been proven by the Government to be guilty beyond a reasonable doubt.

Now, because the constitutional language is cast in these terms that the Government has to prove him guilty, he has to do nothing. He can say to the Government, "You've accused me. Now you prove it." He does not have to provide any evidence of innocence. He does not have to take the stand. And the jury may take -- do not -- may not take into account in any way whatsoever if a defendant offers no evidence and does not testify himself.

Is there anybody who has a problem with accepting that principle of law?

(No response.)

THE COURT: Okay.

Now, I gather that some lawyers watch a lot of television, and they then get worried that you might think that a trial is like television. It is not.

So any of you who have seen television stories about detecting crime and trials and stuff, ignore that. It has nothing to do with the way a trial really works. And I hope that there are none of you who are regular watchers of CSI and who cannot put aside whatever they may have learned from CSI, which is dead wrong in the context of a real trial.

Is there anybody who can't accept that?

(No response.)

THE COURT: Now, as I understand it, we will probably finish this case -- Mr. Moran, get it to the jury on Wednesday?

MR. MORAN: Depending on when we do the charge conference or everything else, Your Honor.

THE COURT: We'll do that early in the morning before we get to --

MR. MORAN: I think that's a fair estimate.

THE COURT: So the jury will have the case Wednesday?

MR. MORAN: I would think so, Your Honor.

THE COURT: Our schedule will be that when we finish this impaneling, we will take a brief recess. Counsel will then open the case -- give you opening statements and then call their first witness. We will hear witnesses until 1:00 today. We will resume tomorrow at 9:00 and go until 1:00, and hopefully by that time all the evidence has been presented to you.

Then on Wednesday morning, I would meet with counsel early, like about 8:30. I would ask you to be here at 9:00. And we would then -- I'll meet with them to tell them what I will tell you the law is so they can tell me, before I tell you, if I'm wrong. And then at 9:00 we would start with you with their closing arguments and summations and then my instructions on the law. Not right?

MR. MORAN: We may have one or two brief witnesses on

Wednesday, as well. But I think we will certainly be able to give the case to the jury on Wednesday.

THE COURT: Well, hopefully not, because we can't have the charge conference until after the witnesses are finished, right?

MR. MORAN: We will do our best.

THE COURT: Thank you.

So on Wednesday, I would ask those of you who will be the jurors in this trial to be available into the afternoon in case -- you know, just so you have ample time to reach a verdict. We will not likely hang around into the night and -- but I will ask what you wish to do, those of you who are jurors, and adhere to whatever your desires are.

Does that schedule cause anyone serious inconvenience?

Nobody in the jury box, right?

Ms. McNulty.

THE CLERK: Juror No. 35.

THE COURT: Anybody -- Mister --

THE CLERK: Dubord, 33. 33, Judge. And 40.

THE COURT: Mr. Dubord.

THE CLERK: Yes.

THE COURT: Yes.

THE CLERK: And then Mr. James.

THE COURT: And Mr. James.

THE CLERK: Yes.

42

THE COURT: That's it?

(No response.)

THE COURT: Is there any reason that I haven't specifically asked about why anybody feels that he or she cannot be a responsible, fair juror?

Mr. Wood.

THE CLERK: Number 3.

THE COURT: Number 2.

THE CLERK: Three and two, Judge.

THE COURT: And Ms. Szendey.

THE CLERK: Yes. Ten.

THE COURT: Anybody else?

THE CLERK: Number 5, also. Six. I'm sorry, Judge. Mr. Osterberg.

THE COURT: I'm sorry.

THE CLERK: I'm sorry. It was Number 6, Mr. Osterberg.

THE COURT: Mr. Osterberg.

THE CLERK: Yes.

THE COURT: And Ms. Cullen.

THE CLERK: Ms. Cullen is 22.

THE COURT: Anybody else?

THE CLERK: Yes. Juror Number 20, Judge.

THE COURT: Anybody else?

(No response.)

THE COURT: Okay. Relax. I'll talk to those of you who answered yes to any of the questions. We will do this as quickly as we can.

If anybody needs to go to the bathroom, they are -- you need to go out and down the line to sort of where the elevators are, and please come back.

(At sidebar.)

THE COURT: Mr. Wood.

THE CLERK: Juror Number 2.

THE COURT: You need to make room for the -- just move over.

Mr. Wood.

(Juror approaches sidebar.)

THE JUROR: Good morning, Your Honor.

THE COURT: I understand that you are a sheriff, and you think you can't be a fair juror in this trial.

THE JUROR: Not knowing the witness list, three people that I have worked with and supervised over the years work on the FBI task force. So I may know one of the witnesses as well as if it --

THE COURT: No objection to excusing him?

MR. TZENG: None, Judge.

THE COURT: Do we have another impaneling?

THE CLERK: Yes. We have a bunch, Judge.

THE COURT: So we'll find another case for you. If

you would please return back to the jury lounge. Take your ticket and give it back to them. And I thank you.

THE JUROR: Thank you, Your Honor.

MR. TZENG: Nice to see you again.

(Juror steps away from sidebar.)

MR. MORAN: Judge, you did not read the witness list, it occurs to me now.

THE COURT: You didn't ask me to.

Excused for cause.

Mr. Mendoza-Vivas, please.

THE CLERK: Juror Number 3.

(Juror approaches sidebar.)

THE COURT: You said you had some views about drug laws?

THE JUROR: Drug laws, it's hard to explain. I don't think it's fair to persecute people based on, like, possession, the amounts of possession. So I don't know how I'm going to be able to understand why or what the case is in terms --

THE COURT: You think possession should not be a crime?

THE JUROR: Yeah.

THE COURT: Well, but the -- this case is one in which the defendant is charged with distributing.

THE JUROR: Distributing, okay.

THE COURT: I'm pretty sure that's what the indictment

said.  Do you have a problem with that?

THE JUROR:  No.  Just this detail.

THE COURT:  Would your views about the possession make it difficult for you to be a juror -- a fair juror in the case?

THE JUROR:  Yeah.  I think a lot of the other stuff was, like, about police and law enforcement, as well, I don't know -- I don't think my views would match up to the case in terms of, like, believing police.

THE COURT:  You are not just trying to get out of jury service, are you?

THE JUROR:  No, I'm not.

THE COURT:  Any questions?

MR. MORAN:  When you said, sir, that you viewed the drug law as persecuting people, what do you mean by "persecuting"?

THE JUROR:  Like, they are out to get certain people or -- persecution is like law enforcement either planting or, like, persecuting certain individuals over other individuals.

MR. MORAN:  And it sounds like you think a law enforcement witness -- you find it believable that a law enforcement witness would plant evidence?

THE JUROR:  Yes.

MR. MORAN:  Okay.

THE COURT:  Any questions?

MR. TZENG:  Nothing, Judge.

THE COURT: Any objection to excusing?

MR. TZENG: Absolutely.

THE COURT: You do object?

MR. TZENG: Yes, I do object.

THE COURT: Okay. It seems -- why don't you return to the jury box for the moment.

(Juror steps away from sidebar.)

MR. MORAN: I think he should be excused for cause. He basically said he --

THE COURT: I will excuse him for cause in due course.

MR. TZENG: I object, Judge. Should I make the record now?

THE COURT: I'm going to put a question mark here.

MR. TZENG: I believe that Juror Number 3's beliefs about the law and the system are true and accurate. And, in fact, he exposes himself as perhaps a more fair juror in a case like this, Judge, and I object to his excusing.

THE COURT: Mr. Osterberg.

THE CLERK: Juror Number 6.

(Juror approaches sidebar.)

THE JUROR: How are you doing?

THE COURT: You have a number of issues in this case. Tell us about it.

THE JUROR: My father-in-law is a police officer, uncles. I'm surrounded by police officers. And I don't agree

with people that deal with drugs. I've lost a lot of friends, family to overdoses.

THE COURT: You don't agree with what about drugs?

THE JUROR: Just anything with drugs.

THE COURT: You mean using them or prosecuting people for using them or what?

THE JUROR: Yes. Selling them, just, like, people that sell them.

THE COURT: Does that mean that you can't decide fairly whether a person who's been accused of dealing drugs?

THE JUROR: Yes.

THE COURT: Any objection to excusing him?

MR. TZENG: No.

THE COURT: Okay. Please return to the jury room. Take a ticket with you.

Hold it. Hold it.

We need to give you back your card. And we have a bunch of other trials coming up so maybe there's one that you can do.

THE JUROR: Okay. Thank you.

(Juror steps away from sidebar.)

MR. MORAN: Your Honor, I have a note at counsel table. I'll be right back.

MR. TZENG: And, Judge, while -- can we have some of the ambient sound?

THE CLERK:  Yes.

THE COURT:  I'm sorry?

MR. TZENG:  Can we have ambient sound?

THE COURT:  Yes.

Ms. Szendey.

THE CLERK:  Juror Number 10.

THE COURT:  That's awful loud.

THE CLERK:  Is it?

THE COURT:  Yeah.

(Juror approaches sidebar.)

THE COURT:  Hi.

THE JUROR:  Hi.

THE COURT:  You have a number of issues with our trial.

THE JUROR:  Yes.  I work as a teacher with high school students.  So I've dealt with encounters of them either -- we had a case, not as extreme, of marijuana smoking in the bathrooms.  And then I know of some who definitely have had drug addictions.  And then I also have slight biases against how drug addictions are treated where I don't fully think it should be criminal.  I think there should be more support to actually help people.

And then I also kind of have a lot of research that I've done with students on social justice issues where it's kind of a broken system where oftentimes if someone, for

instance, is like a dealer, they get arrested and then it's hard to get another job again so they go back to drug dealing because they're not able to overcome the system.

THE COURT: Well, the question that you will have to decide if you are a juror in this case is whether Mr. Mallory did, in fact, distribute a small quantity of heroin and crack cocaine. Is that something that you can decide fairly and impartially based on what you hear or is that part of what you feel is wrong and you can't deal with it?

THE JUROR: I think I can do that.

THE COURT: You think you can decide it fairly?

THE JUROR: Yes.

THE COURT: Any questions, Mr. Tzeng?

MR. TZENG: No, Judge.

THE COURT: Mr. Moran?

MR. MORAN: I noticed while the Judge was asking you, you seemed --

THE COURT: Can you hear him?

THE DEFENDANT: No.

MR. TZENG: Step closer.

MR. MORAN: You seem to be giving it a lot of thought because this is a case in which the defendant is accused --

THE COURT: We have this thing up here. You need to speak loud enough so we can all hear you.

MR. MORAN: Sorry. This is a case where the defendant

is accused of distribution. You just said you think that people who are accused of distribution aren't treated fairly. What do you mean by "not treated fairly"?

THE JUROR: What I'm looking at is, like, the big picture of how it ends up often happening in prisons is that often when they return, it's really hard to get a job because you have a criminal record. So statistically a lot of people do go back -- like, even if they are trying to reform, they go back to selling drugs because they can't get money to afford, like, rent or anything else.

MR. MORAN: So it sounds like you have a sympathy towards people who have been accused of drug distribution?

THE JUROR: Yes.

MR. MORAN: And you're saying you are confident you can put that sympathy aside just by the fact that you hold it?

THE JUROR: Okay. Now I'm kind of seeing where you are.

THE COURT: No. I think you have misstated the question. The question was whether she would be able to determine fairly and impartially on the evidence whether or not Mr. Mallory did, in fact, distribute heroin and/or cocaine base, right?

THE JUROR: I can -- I think I can determine fairly whether or not he did. It's more of I have sympathy for how the effects of that are.

THE COURT: Thank you very much.

Wait a minute. You had some other issues, also, as I recall.

THE JUROR: I think that was the big picture for all of it.

THE COURT: Okay. Thank you. Please return to your seat.

(Juror steps away from sidebar.)

THE COURT: I will not excuse her for cause.

MR. TZENG: What number was she? Oh, 10. Okay.

THE COURT: I think that was it on the first page.

MR. MORAN: Number 10, Your Honor.

THE COURT: According to my list, we go to Number 18, right?

THE CLERK: Yes, Judge.

THE COURT: Ms. Sanders.

THE CLERK: Juror Number 18.

THE COURT: And she had some law enforcement relationship.

(Juror approaches sidebar.)

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: You told us that somebody in your family works for law enforcement or you do?

THE JUROR: My brother does. He's a criminal

intelligence analyst for all of New England.

THE COURT: For all of what?

THE JUROR: All of New England police departments.

THE COURT: This is for the state or the federal?

THE JUROR: I don't know.

THE COURT: You don't know?

THE JUROR: That's what he told me.

THE COURT: Do you talk to him about his work?

THE JUROR: Like, how was your day if I see him at night.

THE COURT: Is he in Boston?

THE JUROR: No. He works in Franklin.

THE COURT: Would that relationship make it in any way difficult for you to be a fair juror in this case?

THE JUROR: I don't think so.

THE COURT: Any questions, Mr. Moran?

MR. MORAN: No.

MR. TZENG: Do you live with your brother currently?

THE JUROR: No, I do not.

MR. TZENG: Okay. Do you associate with some of your brother's coworkers at all? Do you go to any kind of functions like that?

THE JUROR: No.

MR. TZENG: Would you tend to believe the testimony of a law enforcement officer over that of another witness just

because of that person's status as a law enforcement officer?

THE JUROR:  No.

MR. TZENG:  Okay.

THE COURT:  Thank you.  Please return to your seat.

(Juror steps away from sidebar.)

THE COURT:  Ms. Stubblefield.

THE CLERK:  19.

(Juror approaches sidebar.)

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  I think you indicated that somebody in your family may have had some drug issues?

THE JUROR:  Yes, ma'am.

THE COURT:  And what -- who?

THE JUROR:  My father.  He was addicted to heroin for 20 years.

THE COURT:  But no longer?

THE JUROR:  No.

THE COURT:  Would that -- what was the time frame when he was?

THE JUROR:  From 1982 to 2002.  So I was probably --

THE COURT:  So for 17 years now.

THE JUROR:  Yeah, about 17 years.

THE COURT:  Would that fact make it in any way difficult for you to be a fair juror in this case?

THE JUROR: I want to say no, but I think maybe yes.

THE COURT: In what way?

THE JUROR: I just hate heroin so it would be kind of hard for me to put that aside.

THE COURT: Any objections?

MR. TZENG: Yes.

THE COURT: Any suggestions -- any questions?

MR. MORAN: No, Your Honor.

THE COURT: Any objection to excusing her?

MR. MORAN: No.

THE COURT: So please go back to the jury room with your ticket and see if we can find another case.

THE CLERK: You have to go back down to two.

THE COURT: Thank you very much.

(Juror steps away from sidebar.)

THE COURT: Ms. Tozier.

THE CLERK: Juror Number 20.

THE COURT: She answered yes to everything.

(Juror approaches sidebar.)

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: Now, you had a problem with everything I asked you about. What is it about this case that makes it so difficult for you?

THE JUROR: The drugs, drug-related issues.

THE COURT: And what is the basis for that?

THE JUROR: I'm a youth minister, and a lot of our young people died from drug-related issues. And I have a cousin and best friend who also died from drug-related issues.

THE COURT: Including the drugs I mentioned?

THE JUROR: Yes. Heroin and cocaine, yes.

And it's very difficult for me to be impartial.

THE COURT: So you couldn't decide whether this defendant did what he's accused of doing? That's the question.

THE JUROR: Yeah. I feel I just -- I have such strong feelings against selling and dealing of drugs that I could not be fair.

THE COURT: Any objection to excusing her?

MR. TZENG: No.

THE COURT: Mr. Moran?

MR. MORAN: No, Judge.

THE COURT: Okay. We'll see if we can find a nondrug case for you. Please take that back to the jury lounge.

THE JUROR: Okay. Thank you.

THE COURT: Thank you very much.

THE CLERK: Back down to two.

(Juror steps away from sidebar.)

THE COURT: Ms. Cullen.

THE CLERK: Juror Number 22.

(Juror approaches sidebar.)

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: You can dump that over there, if you want.

THE JUROR: Thank you.

THE COURT: You indicated that you had a number of issues.

THE JUROR: Yes. I can think of three that might make it difficult for me, off the top of my head.

So, firstly, in 2014 my uncle's son died of a drug overdose. So it makes me feel a little bit more emotionally invested in this case than I'd like to be. Which ties to the fact that I'm a teacher, and I did a lot of work in my undergrad in Brockton Public Schools so I've seen the effects of drugs in that community and those students. I worked with preschool-age students and fourth graders in my community. It would be very difficult for me to separate my personal experience from those students and the effects that I see they are having on their lives from a case like this.

THE COURT: But the question you will have to decide is whether this defendant, Mr. Mallory, did what the government has accused him of. That's it.

THE JUROR: I understand that. I just feel like I'm more emotionally invested than I should be in order to make that decision.

THE COURT: I certainly understand that.

THE JUROR: The third thing had to do with police officers. So my boyfriend's pretty much entire family are all in law enforcement. It's a career path that he's considering, as well. So I also just feel like I might not be impartial in that way.

THE COURT: Any objection to excusing?

MR. TZENG: No, Judge.

THE COURT: Mr. Moran?

MR. MORAN: No, Judge.

THE COURT: We are losing lots of jurors.

THE JUROR: Sorry.

THE COURT: Please return back to the jury lounge with your ticket. We do have some other cases impaneling today. So thank you very much.

THE JUROR: Thank you.

(Juror steps away from sidebar.)

THE COURT: Ms. Susienka.

THE CLERK: Juror Number 25.

(Juror approaches sidebar.)

THE COURT: Good morning.

THE JUROR: Hello.

THE COURT: You have some issues with drugs, views about drugs, and also some relationship with law enforcement, as I understand it.

THE JUROR: Yes.

THE COURT: Tell us about it, please.

THE JUROR: My cousins have ample drug histories and --

THE COURT: Meaning?

THE JUROR: Meaning either selling or using drugs. And so -- and then I also had somebody in my nonimmediate family, but my cousin's boyfriend, who overdosed by heroin. So that is --

THE COURT: What does that mean in the context of your being a fair juror in a case that involves allegations of drug distribution?

THE JUROR: I mean, I don't think somebody who distributes should, like, be going to jail for it. I think rehabilitation might be the best way for that. But I think -- it would be hard for me to make a decision whether or not somebody was innocent or guilty based off --

THE COURT: Regardless of the evidence?

THE JUROR: Yes.

THE COURT: Any objection to excusing him?

MR. TZENG: No.

MR. MORAN: No, Your Honor.

THE COURT: Please go back to the jury lounge. But you need to take your ticket with you.

THE JUROR: Thank you.

THE COURT: There's some other cases impaneling.

Thank you.

(Juror steps away from sidebar.)

MR. TZENG:  What number was he?

THE CLERK:  He was 25.

THE COURT:  Ms. Sternburg.

THE CLERK:  28.

(Juror approaches sidebar.)

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  You have some issues with the drug case?

THE JUROR:  Just a couple things.  So I did have a sibling who had addiction issues 15 years ago.  And as part of my job, I spend time with psychiatrists' offices, and many of them -- and specifically in Brockton -- and many of them deal with patients with addiction.  So I am -- as a result of that, I'm privy to see what patients on heroin and cocaine have done to clients, patients, and their struggle with addiction.

THE COURT:  Would that mean that you cannot decide fairly on the evidence you hear in this case whether or not the Government has proven that Mr. Mallory did distribute heroin and --

THE JUROR:  I just feel like I'm -- in the spirit of transparency, I have bias against those substances.  And the patients, clients have to get them some way, so I've sort of slanted one way.  I mean, I'm just being honest.

THE COURT: Any questions, Mr. Tzeng?

MR. TZENG: No.

THE COURT: Mr. Moran?

MR. MORAN: You said you had a bias against the substances. Would you be able to hear the evidence about a person without --

THE COURT: I think that was my question.

THE JUROR: I mean, honestly, no.

MR. MORAN: No, you couldn't?

THE JUROR: I could not. Maybe I used the word wrong. Unbiased, biased.

MR. MORAN: No objection, Your Honor.

THE COURT: Thank you. Please return to the jury room to get another assignment.

THE CLERK: Yes. Here's your ticket, please. Thank you.

(Juror steps away from sidebar.)

THE COURT: Mr. Brinkman.

THE CLERK: Juror Number 31.

THE COURT: He knows you.

MR. TZENG: I worked with him in Superior Court, Judge. He's an excellent lawyer.

(Juror approaches sidebar.)

THE COURT: I understand you're an excellent lawyer, and therefore we're sorry to lose you.

THE JUROR:  Thank you.

THE COURT:  So there's no objection?

MR. MORAN:  No objection, Your Honor.

THE COURT:  But we'll try to find another case for you.  Go back down to the second floor.

THE CLERK:  Back down to two, please.  Thank you.

(Juror steps away from sidebar.)

THE COURT:  Mr. Dubord.

THE CLERK:  33.

(Juror approaches sidebar.)

THE COURT:  Good morning.

THE JUROR:  Good morning, Your Honor.

THE COURT:  You had some issues about the case.  And you also had a scheduling issue.

THE JUROR:  Yes.  So the issues with the case are with the drug laws.  Unfortunately, I work in a pharmacy, and I have to interpret those laws as they are written.  So I have various strong feelings based on --

THE COURT:  Which way do the feelings go?

THE JUROR:  There're very -- they are written enough that I believe that if you're in possession of substances declared by the law to be illegal, you should be prosecuted based on that fact.

THE COURT:  And how about the scheduling issue?

THE JUROR:  So, unfortunately, I was in a car accident

last Thursday.

THE COURT:  Sorry to hear that.

THE JUROR:  I lost my car.

THE COURT:  I hope the car survived.

THE JUROR:  It did not.

THE COURT:  I'm glad you did.

THE JUROR:  Yeah, right.  Unfortunately, I have no method of transportation to get to this courthouse.  I have to rely on someone to drive me here.

THE COURT:  Marlborough is a ways to go.

THE JUROR:  Exactly.  It's a two-hour drive from here with traffic.  And unfortunately, I'm in no financial position to take transit or park here if I had a car.

THE COURT:  Any questions?

MR. TZENG:  So based on your employment, you feel like you might not be able to be fair and impartial in a drug case?

THE JUROR:  That is correct.

MR. TZENG:  Okay.  That's it.

THE COURT:  I'm sorry.  What was the question?

MR. TZENG:  It was just sort of asking him about his employment and whether or not that would affect his ability to be fair and impartial, and he answered affirmatively.

THE COURT:  You said no?

THE JUROR:  Yes, it would affect my decision.

THE COURT:  So there's no objection to excusing

Mr. Dubord?

MR. TZENG: No objection. Thank you. Good luck.

THE COURT: Thank you. Please go back to the second floor. Explain to them about your accident and see if maybe they can let you go if we have certainly enough jurors for other cases.

THE JUROR: Okay.

THE COURT: Thanks.

(Juror steps away from sidebar.)

THE COURT: Ms. McNulty.

THE CLERK: 35.

(Juror approaches sidebar.)

THE COURT: Good morning.

THE JUROR: Hi. Good morning.

THE COURT: You have a scheduling problem with our short little trial?

THE JUROR: I am a lawyer, and I have a trial starting tomorrow in Middlesex Superior Court.

THE COURT: Who is the Judge?

THE JUROR: Karen Green.

THE COURT: Why can't I call her and tell her?

THE JUROR: You can.

THE COURT: I mean, you know -- when we had a trial, Lisa was called to be a juror in the state court, and she spent almost two weeks there in a case that should have taken less

than one week.  But it was a murder case.

THE CLERK:  Yes, it was.

THE COURT:  And I learned a lot from that what judges are not supposed to do.  How do you feel about it?  Would you like me to call?

THE JUROR:  I haven't checked in today because I had to give up my phone.  On Friday they said we were starting tomorrow.  That could have changed today.

THE COURT:  Do me a favor and check, and let me know.  And then let me know whether you would like me to call the judge.

THE JUROR:  Okay.

THE COURT:  And let me have a number if you do, and I will explain to her that you're here.

THE JUROR:  Okay.  Yes.

THE COURT:  Thanks.  You know, so I'm not either denying or allowing.

MR. TZENG:  Can I follow up?  Is now the appropriate time?

THE COURT:  Wait a minute.  You want to have a question?

MR. TZENG:  Nice to meet you.

What kind of law do you practice?

THE JUROR:  I do insurance defense.

MR. TZENG:  Is your experience -- have you ever

practiced in criminal prosecution?

THE JUROR: No, no.

MR. TZENG: Does your experience as an insurance defense attorney affect in any way your ability to be fair and impartial in a case like this?

THE JUROR: No.

MR. TZENG: Okay. Thank you.

THE COURT: Okay. I'll hear from you later.

THE JUROR: Yes.

THE COURT: Thank you very much.

(Juror steps away from sidebar.)

THE COURT: Did Karen Green used to be here?

MR. MORAN: Before my time, Your Honor.

THE CLERK: Where is she going?

THE COURT: She's going to make a call to the court to find out what her schedule is.

THE CLERK: She has to go downstairs to get her phone to make a call.

THE COURT: Whatever she is going to do.

Ms. Carter.

THE CLERK: 37.

(Juror approaches sidebar.)

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: You have some relationship to law

enforcement?

THE JUROR: Yes. My uncle on my mom's side, he's retired, but he worked for the state police. He was an officer for, like, many years. And then my cousin works for the state police now. It doesn't really make it a problem for me. I just thought, like, maybe it would be something you might want to know.

THE COURT: Well, I do. Well, I do. But now that I know it, do you live with either of these law enforcement people?

THE JUROR: No. They're from New Hampshire.

THE COURT: Would these relationships make it in any way difficult for you to be a fair juror in this case --

THE JUROR: No.

THE COURT: -- in which law enforcement are a lot of the witnesses?

THE JUROR: No, it shouldn't.

THE COURT: Okay. Any questions, Mr. Moran?

MR. MORAN: No, Your Honor. Thank you.

THE COURT: Mr. Tzeng?

MR. TZENG: Are you confident you can be fair and impartial in this case?

THE JUROR: Yes.

MR. TZENG: Okay. Thank you.

THE COURT: Thank you.

(Juror steps away from sidebar.)

THE COURT: Ms. James -- Mr. James.

(Juror approaches sidebar.)

THE COURT: Oh, there you are.

You had a number of issues.

THE JUROR: Okay. Well, the first one was about my --

THE COURT: The first one was use of drugs.

THE JUROR: So my little brother, he had a lifelong drug problem, and he died of a drug overdose in 2016.

THE COURT: Would that affect your ability to be a fair juror?

THE JUROR: It would, because he had problems since he was a teenager, and he got into it at parties and everything like that. That's obviously something that's very painful for me.

THE COURT: The issue in this case is whether the defendant did what he's been accused of doing.

THE JUROR: Sure.

THE COURT: Can you -- are you telling me that you cannot decide that impartially and fairly based on the evidence that will be presented in the court, the testimony of various people? That's what jurors have to do.

THE JUROR: Okay. I think I could. Given my family history with this is kind of -- I have a little bit of a bias, I feel.

THE COURT:  I think you indicated, also, the scheduling issue?

THE JUROR:  Yeah, scheduling.  So I'm a professor at Salem State, and I'm in the middle of my semester.  So I've got to teach later tonight, and then I've got classes on Wednesday.

THE COURT:  During the day?

THE JUROR:  Yeah, during the day.

THE COURT:  And what happens if you can't show up there?

THE JUROR:  Well, I'm sure the students will love it. I'd have to cancel class.  But I could -- I'd have to make arrangements.  I'd have to probably get somebody because we're in the middle of a semester end wrap-up.

THE COURT:  Any questions, Mr. Moran?

MR. MORAN:  I think Mr. James had another issue.

THE JUROR:  Yeah.  So my sister's husband, he's almost 30 years as an ATF agent.

THE COURT:  He's still active?

THE JUROR:  He's still active.  He's about ready to retire.

THE COURT:  Do you see him regularly?

THE JUROR:  No.  He lives in California, but I talk to him about once a week.

THE COURT:  About his work?

THE JUROR:  Yeah.  He'll tell me about things that

are -- obviously that are not classified that he can talk to me about. He loves his job. So I'm kind of a sounding board a lot of times on what's going on with him.

THE COURT: Would what you learn from him make it in any way difficult to be fair here?

THE JUROR: See, I would -- given the stuff with my brother and then this, it would, because he's told me some things that are, you know -- about, you know, about drugs that was a large detail of what he does. I could try. But, again, I've got these other outside influences.

THE COURT: Any questions?

MR. TZENG: What subject do you teach?

THE JUROR: I teach marketing. I teach business.

MR. TZENG: Okay. And then, when you were talking about this unfortunate situation with your brother, you mentioned, I think -- you ended the sentence with you might have a bias.

THE JUROR: Yeah.

MR. TZENG: For or against? In which way?

THE JUROR: Well, the background on this is that he was probably in junior high school when he got kind of mixed up with kind of the wrong folks and went down that path. And he struggled with it his whole life. And I just know, just based on the scenario of what you told me, this happened at some neighborhood get-together. Just when I heard -- that's kind of

how my brother got started down that path.

MR. TZENG: So when you're talking about a bias, you're indicating that you might be harboring a bias against the defendant?

THE JUROR: I may. If I hear more details of the case -- if it's too similar to what he experienced, that would have an influence.

MR. TZENG: Okay. Thank you.

THE COURT: Any objection to excusing him?

MR. TZENG: No.

THE COURT: Okay. There are other cases being impanelled.

THE JUROR: Okay.

THE COURT: So please go down, and maybe we can find one that you can do, both through schedule and otherwise. Thank you very much.

THE JUROR: Thank you.

(Juror steps away from sidebar.)

THE COURT: Mr. Mokoid.

THE CLERK: 41.

(Juror approaches sidebar.)

THE COURT: Hi.

THE JUROR: Hello.

THE COURT: You indicated some feelings about drugs and drug laws.

THE JUROR: Yeah. I'm a proponent, advocate, supporter of legalizing drugs across the board. I'm a libertarian. You know, distribution, purchasing drugs, it's up to your free will. If you want do it, don't do it in my backyard. That's just my opinion. I don't know if that has any effect on this case.

THE COURT: Would that make it difficult for you to decide whether or not the Government had proven him guilty, the defendant guilty?

THE JUROR: That's a good question.

THE COURT: That is the question.

THE JUROR: I know. I guess not. I guess I feel like it's a waste of my taxpayer dollars to be in this manner in the court in this first place, but I don't know. I guess it doesn't.

THE COURT: It does not?

THE JUROR: No.

THE COURT: Any questions, Mr. Moran?

MR. MORAN: I do. Thank you, Your Honor.

Sir, you were --

THE COURT: Can Mr. Mallory hear Mr. Moran?

MR. MORAN: Sir, you sounded like you had a hard time answering the Judge's question about whether you'd be able to apply the laws.

THE COURT: That's a characterization that I would not

join in.

MR. MORAN:  Okay.

THE JUROR:  I can understand the laws.

MR. MORAN:  It sounds like you also feel that it's a waste of your own money as a taxpayer to even have this case. Would you be able to put that aside while you were hearing the evidence?

THE JUROR:  Yes.

THE COURT:  Any questions, Mr. Tzeng?

MR. TZENG:  No, Judge.

THE COURT:  Thank you very much.

(Juror steps away from sidebar.)

THE COURT:  Mr. Matthews.

THE CLERK:  Four-two.

(Juror approaches sidebar.)

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  You indicated that there had been some drug issues in your family?

THE JUROR:  Yes.  My daughter has been dealing with addiction for years, to the point that we have custody of her two children.  We've had one nine-year-old granddaughter since she was a year old.  We just got custody of the 18-month-old child.  And she was also charged, but never convicted, for conspiracy because she drove her dealer to a buy, and the

charges were dropped because the undercover police officer wouldn't come forward.

THE COURT: Would that -- I'm sorry -- unfortunate family situation make it difficult for you to be a juror to decide whether or not this defendant did what the Government has accused him of?

THE JUROR: I would think if everything was laid out pretty much in black and white, I'd be able to make a decision.

THE COURT: So you can -- do you feel that you can fairly judge --

THE JUROR: Yeah.

THE COURT: -- on the testimony and the other evidence that you see whether or not he's guilty?

THE JUROR: Yes, I think so.

THE COURT: Not is guilty. Has been proven guilty.

THE JUROR: Has been proven guilty, yeah, I think I can do that.

THE COURT: Any questions, Mr. Tzeng?

MR. TZENG: No, Judge.

THE COURT: Mr. Moran?

MR. MORAN: Sir, where was your daughter charged?

THE JUROR: In Pembroke.

MR. MORAN: Do you have any feelings about law enforcement's use of undercover agents, cooperating individuals as it relates to that case?

THE JUROR: No, no.

THE COURT: Thank you very much. Please return to your seat.

(Juror steps away from sidebar.)

THE COURT: Now we need to count. We need 16 to begin with.

MR. MORAN: 14, Your Honor. Twelve and two alternates.

THE COURT: Yeah, 14. Sorry. No. Actually, I was counting the peremptories. Six plus ten. That's how I got the 16.

MR. MORAN: Sorry, Your Honor.

Mister -- Juror Number 3, Mr. Mendoza, still needs to be excused for cause.

THE CLERK: Are we?

MR. TZENG: He shouldn't, Judge.

THE COURT: I've forgotten what his problem was. Three, he was --

MR. TZENG: His problem was that he could be a fair and impartial juror on this case.

THE COURT: He said he could be?

MR. TZENG: Yes.

MR. MORAN: No, Judge. He said he could not. He said he could not --

THE COURT: No, I don't remember that.

MR. MORAN: -- drug laws. You indicated that you would excuse him. You just wanted to do it after he went aside because he did indicate he could not apply the laws fairly and was uncomfortable with that.

THE CLERK: I'm not sure the judge said she was going to excuse him, though. I thought we were thinking about it.

THE COURT: I'm going to think about it. I didn't say I would excuse him. I think I'll just leave him in here, first, at least until we finish counting.

So we need all together -- you're right -- 14 jurors.

Plus ten peremptories for you. So 24.

Plus six for you. 30.

Plus one for the alternates. 31.

THE CLERK: I think that's exactly what we have, if I'm not mistaken.

THE COURT: So let's see what we have left.

THE CLERK: 32.

THE COURT: I have six plus seven. 13.

Plus nine. 22.

Plus ten. 32.

So we have enough jurors.

THE CLERK: Yes.

THE COURT: So let me know in about two minutes whom you wish to excuse.

MR. TZENG: Could you refresh my memory on the

process, Judge. Who uses the peremptories first? And then do we fill the box?

THE COURT: I think the way we usually do it is Government goes one and you go two until you're even. Then it's one back and forth. You get ten and he only gets six.

MR. TZENG: If I fail to use a peremptory on somebody who is currently in the box, do I forfeit?

THE COURT: Everybody is in the box.

You can start with Juror Number 40 or whatever the last one is, if you want to.

MR. TZENG: Okay.

THE COURT: But you may never get there.

MR. TZENG: Right. I understand. Thank you.

THE COURT: It's open for the entire array.

MR. TZENG: Okay. But -- okay. I think I got it.

THE COURT: And we start with the Government with one, you do two, one, two for the panel in chief.

And then for the peremptories, we start with you one and he one.

MR. TZENG: Okay. Can I just have a chance to speak?

THE COURT: Of course.

MR. TZENG: Thank you.

(End of sidebar.)

(Pause.)

(At sidebar.)

THE COURT:  Okay.  Mr. Moran, one.

MR. MORAN:  Juror Number 3, Your Honor.

THE COURT:  Mendoza-Vivas?

MR. MORAN:  Yes.

THE COURT:  Mr. Tzeng?

MR. TZENG:  I object.

THE COURT:  I'm sorry?

MR. TZENG:  I object.

THE COURT:  It's a peremptory challenge.

MR. TZENG:  I understand.  Number 1.

THE COURT:  You have a second one.

MR. TZENG:  Number 7.

THE COURT:  Anna Gross.

Mr. Moran, anybody else?

MR. MORAN:  Yes, Your Honor.

Number 10.

THE COURT:  Szendey.

Anybody else, Mr. Tzeng?

MR. TZENG:  Number 15, Your Honor.

THE COURT:  Annabel Greenberg.

Anybody else?

MR. TZENG:  Number 16, Judge.

THE COURT:  Jessica Holli?

MR. TZENG:  Yes.

THE COURT:  Mr. Moran?

MR. MORAN:  Number 27, Your Honor.

THE COURT:  Julia Degallere.

Mr. Tzeng?

MR. TZENG:  My next one was going to be for 42, Judge.

Is there any way that I could see what the current jury make-up would be?

THE COURT:  We're not likely to get -- is 42 the very last one?

THE CLERK:  It's one under.  I think we have 43.

THE COURT:  We have 32 total.  So that if everybody exercises all challenges, the last two aren't likely to be picked.

MR. TZENG:  Okay.  Understood.

Just one second, Your Honor.

(Pause.)

MR. TZENG:  Juror 11, Judge.

THE COURT:  I'm sorry?

MR. TZENG:  Juror 11.

THE COURT:  Steven Buldini.

Anybody else?

MR. TZENG:  12.

THE COURT:  Lisa Kunkel?

MR. TZENG:  Yes.

THE COURT:  Okay.  Now, the Government has three left.  The defendant has four left.

The next one is still Government, and after that we go even back and forth. No. Both of you have three left. So one and one back and forth now.

No, that's not right.

He's got six and you've got three. So which one?

MR. MORAN: So it's --

THE COURT: I'm sorry. Whom are you challenging now?

MR. MORAN: I'm counting them to see how far we are going to get, Your Honor.

THE COURT: If everybody uses all challenges, the only two we don't get to are the last two on the list.

MR. MORAN: I'm going to strike Juror 41, Your Honor.

THE COURT: 41, Mr. Mokoid.

Mr. Tzeng?

MR. TZENG: Sorry. Number 37.

THE COURT: Julia Carter.

Anybody else?

MR. TZENG: If I could have just one second with Mr. Mallory?

(Pause.)

THE CLERK: Judge, so Juror Number 35, that woman attorney, that was -- she just came back in. Are you going to talk to her or wait to see if she's picked?

MR. TZENG: Is Juror 18 still around?

THE COURT: I'm sorry?

MR. TZENG:  Is Juror 18 still around?

THE CLERK:  Yes, yes.

MR. TZENG:  Then 18.

THE COURT:  I'm sorry?

MR. TZENG:  18.

THE CLERK:  18, okay.

THE COURT:  That's Katherine Sanders.

THE CLERK:  Yes.

THE COURT:  The lawyer who needed to check on her trial has returned.

THE CLERK:  I didn't know if you want to talk to her.

THE COURT:  Do you want to -- I have forgotten her name.  Which number was she?

THE CLERK:  I think 25 -- 35.  I'm sorry, Judge.  35.

MR. MORAN:  35, Judge.

THE COURT:  I mean, she's still on our list.

MR. TZENG:  Whatever the Court's pleasure.

THE COURT:  So are you likely to choose her?

MR. MORAN:  I don't know, Judge.  But she would be seated right now.

MR. TZENG:  Maybe we should ask.

MR. MORAN:  We should ask.

THE CLERK:  McNulty.

THE COURT:  Ms. McNulty, can we talk to you, please.

(Juror approaches sidebar.)

THE COURT: So what's the scoop?

THE JUROR: My trial got continued so I'm clear.

THE COURT: Oh, great. Is that good for you, I hope?

THE JUROR: Yes.

THE COURT: Oh, good. Thank you.

(Juror steps away from sidebar.)

THE COURT: All right. So she's part of the list.

THE CLERK: So she's in.

THE COURT: I think we had finished two of yours.

MR. TZENG: Yes.

THE COURT: Now, we go back -- let's see. You have eight, and the defense has four. So I think two and two is right. So you do one and you do one, twice.

MR. MORAN: Number 17, Your Honor.

THE COURT: Ana DaSilva.

MR. TZENG: Number 35, Judge.

THE COURT: Ms. McNulty.

You have one more, Mr. Moran?

MR. MORAN: Your Honor, the Government is content.

THE COURT: You also have one.

MR. TZENG: Mr. Mallory has a difficult time seeing. Can I just have a second with him on this last one at the table just in case?

(Pause.)

MR. TZENG: I think we're all set, Judge.

THE COURT: Okay. I think, if you count, we go through number 30 for the jurors that are -- the nonalternates.

MR. TZENG: So where does that bring us?

THE COURT: Now you can choose anybody.

MR. TZENG: That's fine.

THE COURT: Anybody who is still open. We'll start this one with you, one. And he has one for the alternates.

THE CLERK: Okay.

MR. TZENG: So I have another peremptory specifically for the alternates?

THE COURT: Yes. You have one challenge for the alternates, and we will seat them in the order in which they remain. Or do you want me to do it now?

THE CLERK: No.

THE COURT: There's still some jurors who haven't been challenged and who are not disqualified, and you can choose any one of them.

MR. MORAN: The last two numerically will be the alternates.

THE COURT: But if you choose somebody from the beginning, then that person will be an alternate rather than -- no -- will be gone period. It's the same.

MR. TZENG: It's hard for me to tell based on people who are currently here of sort of where we are at.

THE COURT: We are likely to seat -- if nobody

challenged at the beginning of the list, the last one sat -- who will be seated -- I think the last one seated on the impaneling sheet is Number 30.

THE CLERK: Yes, that's it.

THE COURT: And then -- so if you want the panel, now it's constituted to remain as the jurors, the main jurors, then you would start with Number 32 to challenge the remaining ones for alternates.

MR. TZENG: Okay. To be honest with you, Judge, I think I'm probably just content at this point.

THE COURT: Okay. How about you?

MR. MORAN: I am also content.

THE COURT: All right. Let's now review who is who.

MR. MORAN: Actually, you know what, Judge? I would like to strike -- I would like to strike Juror Number 32.

THE COURT: As your alternate?

MR. MORAN: Yes. In a three-day trial it's unlikely to be necessary.

THE COURT: You never can tell.

MR. TZENG: Judge, I probably should strike 42 now, just in case.

THE COURT: 42, Mr. Matthews, defendant alternate.

Okay. So the jurors who will be actually deciding the case in the end:

Juror Number 4 on the list is one.

Five on the list is two.

Eight on the list is three.

Nine, four.

Number 13 on the list is five.

Fourteen, six.

Twenty-one, seven.

Twenty-three, eight.

Twenty-four, nine.

Twenty-six, 10.

Twenty-nine, 11.

And 30, 12.

Thirty-four is Alternate 1.

And 38, Alternate 2.

And we have two left over, which is what we predicted.

Okay?

MR. MORAN:  Yes, Your Honor.

THE COURT:  How long will your opening be?

MR. MORAN:  Ten minutes or so.

THE COURT:  Are you opening now or later?

MR. TZENG:  I'm opening now.  It might go -- I haven't timed it.  Maybe 20.

THE COURT:  20 minutes?

MR. TZENG:  I have got to say something.

MR. MORAN:  Judge, I'm going to go 20 minutes, then.

(End of sidebar.)

THE COURT: Thank you very much for your patience. This is a tedious process, but I can assure you -- Yes?

THE JUROR: Can you turn the music off? It's hard to hear you.

THE CLERK: Yes, I am. I still had the music on.

THE COURT: The music is supposed to drown me out, and I guess it did. That's okay.

So the following are going to be the jurors in this trial, and everybody whose name I do not call is excused from further service in this courtroom. There are other trials being impanelled today before other judges. So those of you who are not going to be a juror in this courtroom, please do not take off. Wait until Ms. Urso gives you your ticket back, and then return to the second floor to see where else you might be able to be of assistance and learn something.

So Ms. Kurina in Seat Number 4, you will be Juror Number 1 in the trial.

Ms. Reynolds-Johnson, you are Number 2.

Mr. Ennott, you're Number 3.

Mr. Rosenberg, you're Number 4.

Ms. Walker, you are Number 5 for trial in this case.

And Ms. Sherman, Number 6.

And then we go further out.

Ms. Foynes, you are Number 7.

Mr. Borden, Number 8.

And Mr. Leonard, Number 9.

Are you there?  Okay.

Mr. Rivera, you are Juror Number 10.

Mr. Blake, Number 11.

And Mr. Condon, Number 12.

Mr. Vanella, you're Number 13.

And Mr. Kyle, you're Number 14.

Those whose names I did not now call, please wait to get your ticket, and then report back to the jury lounge with great thanks from me for your patience and for participating so well.

While Ms. Urso finishes that, Ms. Kurina, you might as well move into Seat Number 1.

And Ms. Reynolds-Johnson into Seat Number 2.

And then in the back row, you, Mr. Ennott, you're Number 3.

And Mr. Rosenberg, Number 4.  You've got it.

And then from the back, Ms. Walker, you're Number 5.  So you're next -- you're the next-to-last seat, I guess.  Is it the last seat?

Wait a minute.  Something isn't quite right.

Mr. Ennott is in Seat Number 4 [sic].

Mr. Rosenberg in four.

Ms. Walker in five.  You're Ms. Walker?

THE JUROR:  Yes.

THE COURT: And Ms. Sherman, Number 6.

And Ms. Foynes will be Number 7. In that row (indicating).

Mr. Borden, you take the second row, the first seat the furthest from you.

Mr. Leonard, the one after that.

Mr. Rivera, you take the next one on the second row.

Mr. Blake, the one after. Ms. Blake. Sorry. You take the next seat.

And Mr. Condon, the one after that.

And then we come to Mr. Vanella, who takes the seat following.

And Mr. Martin, the one after that.

THE CLERK: Are you Mr. Martin?

THE COURT: Perfect.

THE JUROR: She called me by my first name but...

THE CLERK: Okay.

THE COURT: All right. Members of the Jury, we will take a brief recess now. Ms. Urso will show you the jury room where you will hang out during this trial. I'm sure she has made some coffee for you. Tomorrow we will stop at about the same time for a break with refreshments, which we haven't ordered today because we didn't know where we would be at this point in time, but you will have your coffee.

And when we return, we will start the rest of the

trial, first with the opening statement by the Government, which will outline to you the evidence that they will present to you. I will talk to you a little about that when we come back. Mr. Tzeng will follow on behalf of the defendant. And then the Government will call its first witness, and we will be moving along.

So you are now excused for about 15 minutes or so for our recess, and then we will go to the next step of this trial.

THE CLERK: All rise, please.

THE COURT: Court is in recess.

MR. MORAN: Your Honor, during my opening I intended to use two stills, 8.1 and 8.2.

THE COURT: If there's objection, please either work it out or don't use them in your opening.

(Recess taken from 11:12 to 11:30 a.m.)

THE COURT: With respect to the motion concerning the identification of the video, I think I previously ruled out the messages. Your objection is noted. And I think I will also rule out the identification because it really does seem to me incredibly prejudicial. Again, your objections are noted.

The jury will have the video. If it turns out -- maybe, actually, what we could do is at the end of the day view it briefly and see what it, in fact, shows, and then I'll rule on it. But at the moment my inclination is to say no to that. And I think there was one other motion.

MR. TZENG: Was it the 404(b), Judge?

THE COURT: I'm sorry?

MR. TZENG: The reverse 404(b) evidence?

THE COURT: Yes.

Oh, the impeach a Government witness, that's the one.

MR. TZENG: Yes.

THE COURT: Well, I think you can ask about any -- whether the prior offense is a perjury or something of the sort but not get into anything else. If it is an offense that has to do with his credibility, you may ask whether that's what it is or what it is.

MR. TZENG: It does have to do with his credibility. I can see the jury might be --

MR. MORAN: Judge, there was one other matter, the probation records. I've --

THE COURT: Let's bring the jury in. We'll talk about it later. You will leave that for purposes of your opening.

THE CLERK: All rise, please.

Could I ask you all please to remain standing just for a brief moment so I can swear you in.

THE COURT: The rest of you may be seated.

THE CLERK: I ask you all to raise your right hands.

THE COURT: Is somebody missing?

THE CLERK: No.

THE COURT: Okay.

(Jurors sworn.)

THE JURORS:  (In unison) I do.

THE CLERK:  You can be seated, please.

THE COURT:  Members of the Jury, a trial goes in preorganized stages.  We have finished the impaneling of the jury.  We now go to the, as I mentioned to you before, the statement of counsel as to what they're going to -- what the case is going to be like from here on in.  And the Government starts.  The defendant has an opportunity to do the same.

After that, you will hear the witnesses, one after the other.  They will be sworn.  They'll be over there, and they will testify initially by the party that calls them, largely the Government in this case -- or certainly in the beginning the Government, and then the defense has an opportunity to cross-examine.

And then we have another round.  The Government may ask questions again of the same witness and the defense as well.  And that's it.

And once we finish with the testimony of all the witnesses, then counsel will address you once again.  This time it is different.  The purpose of the opening statement is to give you the context of this case, to give you some idea what this case is about so that you can have some understanding of even what the first witness tells you and begin to make judgments about whether you believe what that person tells you

or not.  It's very hard to do that when you don't know anything about the case and you hear somebody suddenly talking about something you don't know anything about.  So the purpose of this opening statement is to give you the context to allow you to understand even the first witness in the case.

When counsel addresses you again, you have heard all the evidence, and at that point that purpose is very different.  It is in part to sum up, to recall the evidence for you; and in part, to persuade you on the basis of the evidence, which is why it's sometimes called summation and sometimes it's called the argument, closing argument.  Both of these terms describe exactly what it is, and it is helpful to you to have counsel do that.

Once they finish, I will instruct you on the law.  And I will have -- I will do that after I have reviewed what I will tell you with the lawyers so that if I'm wrong, they can correct me before I tell you.

And when that's done, you retire to the jury room and deliberate on your verdict.  Okay?  So that's how it will go.

And we're moving right along so I hope that we will stick to the schedule that I outlined to you earlier today.

So, Mr. Moran, you may open.

MR. MORAN:  Thank you, Your Honor.

THE COURT:  I'm sorry.  I can't see you at all.

Thank you.

I should never be deprived of seeing counsel.

MR. TZENG:  Judge, Mr. Mallory needs an opportunity to view, too.

THE COURT:  Do you want him to move it further back or do you want to show it to him, Mr. Mallory?  You can take it off the stand.  No, he can't see it from there either.

(Exhibit shown to defendant.)

THE COURT:  Thank you.

GOVERNMENT OPENING STATEMENT

BY MR. MORAN:

You've all heard that sometimes a picture is worth a thousand words.  Here's a picture of this man, the defendant, Allah Mallory, also known as Parod, distributing heroin and cocaine base.  That is a single charge against the defendant that we will prove to you beyond a reasonable doubt that on July 9th, 2018, in Brockton, Allah Mallory, the defendant, distributed heroin and cocaine base.

Where did this photograph come from?  This is a still photograph from a video that came from a recording device that was being carried by an FBI cooperating witness.  On July 9th, 2018, in Brockton, that cooperating witness made a controlled purchase of $100 worth of heroin and $100 worth of cocaine base.  Take a look at the photograph.  There's the defendant with the drugs in his hand.  There's more drugs.  There's the $200 (indicating).

They're in the basement of a house which is at the corner of Milton Street and North Warren Avenue in Brockton. The whole exchange, which you'll see for yourself on video during this trial, took about three minutes.

Now, you probably noticed I used a couple of terms that you may not have heard before: Controlled buy or purchase and cooperating witness. Those two terms explain this drug deal, how the defendant conducted that drug deal on that day, how the FBI acquired evidence of that deal, and how the evidence will prove to you beyond a reasonable doubt that on July 9th, 2018, in Brockton, the defendant, Allah Mallory, distributed heroin and cocaine base.

In this case you'll hear the cooperating witness was able to purchase drugs from the defendant, whom he had known for several years. That's because the cooperating witness here, a man named Travis Davis, himself, had been a drug dealer. In fact, that's what a cooperating witness is, someone who has access to other criminals because he himself is a criminal.

You will hear that Davis had a criminal record, and that the FBI had conducted a search of his home and found him with drugs for which he could have been charged. Instead, he began helping work for the FBI, cooperating with them, helping them identify and target other criminals. He has an agreement with the FBI to work with them and tell them the truth. In addition, he is paid for his time, which he was relocated for

his safety and received some other benefits.

But you will hear that he understands that if he does not tell the truth, he may yet be charged for that previous crime. So Davis began working for the FBI, specifically for FBI Special Agent Tim Kenny. You'll hear from Agent Kenny in this trial. In fact, he'll be the first witness on that witness stand.

Special Agent Kenny instructed Davis to be on the lookout for drug use in the Brockton area. And around the 4th of July in 2018, Davis bumped into the defendant. They struck up a conversation, and Davis confirmed that the defendant was able and willing to sell him drugs. Davis reported that information to the FBI as he had been instructed to do so.

The FBI made the decision to target the defendant, specifically by making a controlled buy from the defendant. Special Agent Kenny told Davis to set up -- asked the defendant to sell him drugs, which the defendant agreed to do. Davis reported that to Special Agent Kenny, and Special Agent Kenny set up a controlled buy for July 9th, 2018.

Now, what is a controlled buy? You will hear from Special Agent Kenny that a controlled buy is where the FBI directs a cooperating witness to buy drugs under circumstances that the FBI controls.

As you already heard, the FBI directed Davis to set up that drug deal. Next, Special Agent Kenny recorded several

phone calls, which you will hear here during this trial, between the defendant and Davis confirming that deal.

Then, prior to the buy, Special Agent Kenny and his colleagues did a few more things. They searched Davis and his car for money and contraband. They provided him with money to make the purchase, that $200, and they equipped him with two recording devices. One was in his car and one was a personal handheld recorder which was also able to transmit during the transaction. Special Agent Kenny turned on and off those recorders. He controlled those recorders, and he watched the transmission of the transaction while it took place.

At the same time, the FBI sent out surveillance. And when Davis returned from the controlled buy, they repeated the process again. They again searched him and his car for contraband or money, and they retrieved the recorders and something else that Davis had not had when he started out, and that was the drugs.

Now, why did they do those things? You will hear that that is what is meant by a controlled buy. The FBI controlled the circumstances so they knew that Davis did not have drugs on him when he left their predetermined meeting location where he didn't have money. At the end -- he went to meet, under their surveillance, with the defendant at 210 North Warren Street in Brockton, and then he had drugs afterward but did not have money. So those drugs, the drugs that you will see in this

case, came from the defendant. And that, you will hear, is what happened on July 9th.

After those phone calls and the procedure I just described, Agent Kenny instructed Davis to meet with the defendant and buy $100 worth of heroin and $100 worth of cocaine base. The agents followed him to the corner of Milton Street and North Warren Avenue in Brockton where the defendant had told Davis to meet him.

Once there, the defendant met Davis on the street and brought him into the basement. Davis followed him into the basement, but then Davis realized he had forgotten to carry -- take with him that personal handheld recording device. So Davis doubled back to the car, grabbed that recording device, and brought it back with him into the basement.

Once Davis retrieved the recording device, he brought it to the basement, and that is where -- and you'll see for yourself on the video from the transaction -- the deal took place. Davis requested a hundo -- a hundo is his word for $100 -- each of brown, which was heroin, and hard, which was cocaine base. It was a small amount of each, practically a sample size.

And you will see on the defendant as -- on the video that the defendant reached over his right shoulder to remove a supply of drugs from a hole in the wall. And you will see as he bagged the drugs, wrapped them in a plastic baggie, and they

were given to Davis, the cooperating witness. And you will also see the $200 used to purchase those drugs placed on the table for the defendant. In fact, the defendant practically narrates the whole thing as he's moving along. He described that he's wrapping it in plastic, and he's just going to hand it over to the defendant [sic]. That's it. The whole exchange, which you'll see on video, took about three minutes.

One more thing, the defendant wanted a cigarette. So he actually followed Davis back out to his car. And there he is here using a cell phone while he went to get the cigarette, as he requested. And that was a still photograph from the recording on the car's recorder.

So that's the story of this case. It's not all the evidence you will hear. You'll also hear from a DEA chemist who tested those samples of heroin and cocaine base and concluded that they were, in fact, heroin and cocaine base. And you'll also hear from a witness who will place the defendant at 210 North Warren Avenue around the time of the transaction on July 8 -- July 9th, 2018.

And that is the evidence in this case. An FBI operation, a controlled buy, which resulted in the video which included this still photograph of the defendant, as you can see, with the drugs in his hand. That evidence will prove to you beyond a reasonable doubt that on July 9th, 2018, the defendant, this man, Allah Mallory, distributed heroin and cocaine base. And

that is why at the conclusion of this case I will address you again, and I will ask you to return a verdict of guilty on this single count because that will be the only verdict consistent with the evidence in this case.

Thank you.

THE COURT: Mr. Tzeng.

MR. TZENG: Thank you, Judge.

DEFENDANT OPENING STATEMENT

BY MR. TZENG:

Thank you, Ladies and Gentlemen of the Jury.

I'm not sure, to be honest with you, how much the prosecutor and I are going to be agreeing on things throughout the course of this trial. But I do agree, to a certain extent, that the Government is going to put on video, they're going to put on witnesses, and they're going to ask you at the end of the case to convict Mr. Mallory.

But so what do I want to talk to you guys about while I have this precious time? And I think what I want to talk with you guys about is a concept that we're all familiar with from our daily lives, and that is trust. How do you know if you can trust somebody? Just think about it in your work lives, people that you work with, family members, friends. Is this person trying to sell me a bill of goods? Is this person trustworthy? Or is this person only out for self-gain? Does this person have something to hide?

And the Government is going to call its star witness, Travis Davis. He's their cooperating witness. And what will become immediately apparent to you in your evaluation of his testimony is that Mr. Davis is not somebody that you can or should trust in the course of this case. He's not trustworthy in any aspect of life. He's a lifelong major, large-scale drug dealer.

In September of 2017, Mr. Davis got pinched with 40 grams of crack cocaine in his home. And what happens to Mr. Davis?

Does he get charged with an offense? No.

Does he get thrown in jail? No.

What happens? The Government cuts a deal with Mr. Davis.

You will hear evidence or he will acknowledge that Mr. Davis has been paid tens of thousands of dollars from your, our United States Government to essentially do whatever he wants to do and to try and ruin the lives of people like Mr. Mallory here, all for his own self-gain.

The Government has chosen to enable Mr. Davis, and that is the person that they will be traipsing through this courtroom and putting on the stand and asking you to trust him to a certain degree. And what happens when the Government does this?

What happens when our United States Government cuts a deal with somebody like Mr. Davis?

I'll tell you. The Government, in getting in bed with

Mr. Davis, has given you license to question the trustworthiness of the Government's evidence, of the Government's case, of the Government's investigation.

And that's not the only benefits that you're going to hear that Mr. Davis has received in the course of his work with the FBI.

Mr. Moran told you in this incident he leaves the camera, the recording device in the car for some period of time. There is some period of time in which you don't see Mr. Davis or hear Mr. Davis. So what are you going to have to do? Who is the only person that the Government is going to call about what happened during that period of time? Mr. Davis. He's going to say that it was a mistake, but you have license to question his credibility. He's one of the most untrustworthy persons you might even encounter.

And so Mr. Moran indicated that the picture that he put up for you was dated -- was on July 9th. Mr. Mallory is arrested about a month and a half later in August.

And the Government flies Mr. Davis and his son out to California. Why? Is that fair? Is this a person who you can trust? And once he gets out there, I'm sure that he -- you're going to hear evidence that he gets arrested for driving a motor vehicle under the influence of heroin and, in fact, admits to taking heroin. And I'm sure that you're thinking, well, the Government must have stopped working with him at that

point in time because he's not a trustworthy person.  No.  They continued to work with him.

What happened with that case where he was arrested?  Whoosh, dismissed.

Not only that, but Mr. Davis's son was on probation in juvenile court out of Norfolk County.  What did the FBI do for Mr. Davis's son?  They got his probation terminated early so he could fly with dad to California.

Mr. Davis has continued to work with the Government to this day.  I would submit to you that what he is is a Government-enabled spy.  What he's doing is spying on our fellow citizens, tens of thousands of dollars, all for his own self-gain.

So I submit to you that I see this case differently than Mr. Moran.  This case is not just about the evidence.  It's about trust.  And one of the great things in our American judicial system is that somebody who's accused of a crime has the right to have -- to have good citizens, you people, in a jury to decide whether or not he did what the Government says that he did.  And the Government must prove this beyond a reasonable doubt.

Proof beyond a reasonable doubt -- and the Judge will instruct you on this -- is the highest standard in the American legal system.  It is so high because what's at stake in this case is whether or not Mr. Mallory is going to be convicted of

the crimes charged and all the things that come with it. And you good people stand between his liberty and the Government. They cannot affect his liberty unless you say so.

You have the power -- you're going to have a vote in a couple of days as to whether or not Mr. Mallory is to be convicted guilty or not guilty.

I suggest that in a case like this, you have the ability, and, I'll say, the responsibility to find Mr. Mallory not guilty if you don't trust the legitimacy of the Government, its witnesses, its evidence in its case. So please be inquisitive. Please be thoughtful. I am sure that you are, and I'm sure that you are going to take it seriously.

Now, in looking at this case through the lens of proof beyond a reasonable doubt, I want you going back into that room when you deliberate, and don't just consider what it is that the Government is showing you. Consider also what the Government will not show, and ultimately, whether or not you can trust the evidence that they're putting in front of you. And because you can't trust them, because you shouldn't -- you shouldn't trust Mr. Davis or what he's telling you, you should find Mr. Mallory not guilty.

Thank you.

THE COURT: All right. Members of the Jury, we will periodically stretch because it's difficult to sit and just listen and do nothing. So you can stretch now while the

Government calls its first witness.

MR. MORAN:  Thank you, Your Honor.  The Government calls Special Agent Tim Kenny.

(Witness sworn.)

THE WITNESS:  Yes, I do.

THE CLERK:  Sir, could you please state your name, spelling your last name, please, for the record.

THE WITNESS:  My name is Timothy Kenny.  Last name is spelled K-e-n-n-y.

THE CLERK:  Thank you.

TIMOTHY KENNY, having been duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MORAN:

Q.   Sir, what do you do for a living?

A.   I'm employed as a special agent with the Federal Bureau of Investigation.

Q.   How long have you been with the FBI?

A.   Since September of 2014.

Q.   What's your current assignment?

A.   I'm a special agent assigned to our violent crime squad where I am involved in investigations that involve gang activity, violent crime, drug trafficking, and weapons trafficking.

Q.   Do you work with any other law enforcement agencies?

A.    I do.

Q.    What are those?

A.    I'm a member of the North Shore Gang Task Force.  As part of that task force, we work with state and locals, Massachusetts State Police, detectives and officers from various local agencies and departments, and also, occasionally we work with other federal agencies.

Q.    You mentioned North Shore.  Is all of your work on the North Shore?

A.    No, it's not.

Q.    Where else do you work?

A.    The North Shore Gang Task Force is named so because the idea was to work from Boston up to the New Hampshire border area, but I also work from Boston south, down through the Brockton area.

Q.    Sir, what's your training to be an FBI agent?

A.    Prior to becoming an agent, you go to approximately a six-month academy where you're trained in various disciplines, including defensive tactics, tactical training, legal training, and some case-specific-type training.

Q.    You mentioned legal training.  What did you do before you were with the FBI?

A.    Prior to becoming an FBI agent, I worked for the Plymouth County District Attorney's Office as an assistant district attorney here in Massachusetts, and I was there from 2008 to

2014.

Q.   So what is your education?

A.   I went to Boston College and graduated in 2005 with a degree in management and marketing.  And then I graduated from Suffolk University Law School in 2008.

Q.   Sir, were you involved in an investigation involving the defendant?

A.   I was.

Q.   Starting when?

A.   The investigation began in the spring of 2018.

Q.   Did you have a partner in that investigation?

A.   I had several partners.

Q.   Who were they?

A.   We worked with the Brockton Police Department, the Boston Police Department, and the Massachusetts State Police.

Q.   Were you a case agent?

A.   I was.

Q.   What does that mean?

A.   To be a case agent means that I essentially run the investigation.  I'm involved in all the administrative nuances. I'm involved in selecting the investigative strategy, selecting the targets of the investigation, and also carrying out the objectives in the investigation.

Q.   Generally, what did this investigation involve?

A.   The investigation targeted violent criminals and repeat

offenders who were involved in drug trafficking and weapons possession and weapons trafficking in the Boston and Brockton area. The investigative strategy was to utilize cooperating witnesses who would give us information and intelligence on who these individuals were and what their criminal activity was, and then to further use those cooperating witnesses to conduct controlled purchases that would be audio and video recorded to use as evidence to charge these individuals with their crimes.

Q. Now, you mentioned you had targets, plural. Were there other targets in addition to this defendant?

A. Many.

Q. You just mentioned a word, "controlled purchase." Sorry. Withdraw that.

You mentioned a cooperating witness. What is a cooperating witness?

A. A cooperating witness is an individual who has agreed to assist our investigation in such a way that they will provide us information, help identify different criminal targets and their activity, and also take it a step further where they'll record their transactions. And ultimately, if they need to, come to court and testify.

Q. Who was the cooperating witness here?

A. The cooperating witness in this case had a code name that was Chef.

Q. Who gave him the code name?

A.   It was either myself or one of the individuals that I work with.

Q.   What is Chef's true name?

A.   Travis Davis.

Q.   Where did Travis Davis come from?

A.   Travis Davis was initially a target, one of -- one of the targets of an investigation I ran in the summer of 2017.  That investigation targeted a single drug trafficker, and Mr. Davis became involved in the investigation because he was identified as a redistributor of that initial drug trafficker's drugs. Ultimately we developed evidence against Mr. Davis and executed a search warrant on his house in September 2017.

Q.   Were you present at the search warrant?

A.   I was not.

Q.   Do you know what was recovered?

A.   I do.

Q.   What was recovered?

A.   Either cocaine or crack cocaine.

Q.   And where did you first meet with him?

A.   I first met Mr. Davis approximately five days following that search warrant.

Q.   How did you meet with him?

A.   I was informed that Mr. Davis would speak with me.  And then I arranged to have him come to this courthouse to sit down with myself, one of my partners, and an Assistant United States

Attorney to be interviewed.

Q.  Was that Assistant U.S. Attorney me?

A.  No.

Q.  Somebody else?

A.  It was Emily Cannon.

Q.  Did you speak with him on that occasion?

A.  Yes.

Q.  Did you interview him then?

A.  We began to interview him.  And in so doing, it became apparent to myself, AUSA Cannon, and my partner, Patrick O'Brien, that Mr. Davis should have counsel appointed before we went any further with the interview.  So we terminated the interview before we got into any real questions.

Q.  Did he later get counsel?

A.  Yes.

Q.  And did you later speak with him?

A.  Yes.

Q.  Generally, what sort of information did Davis provide?

A.  He provided information -- at that initial meeting?

Q.  Yes.

A.  At the initial meeting, he provided information about his activity as it related to the investigation we had run that summer.  He also identified drug traffickers of whom he knew the identity and/or information about their businesses.

Q.  At that time did he speak to you about the defendant?

A. No.

Q. What did you do with that information?

A. We verified the best we can through whatever records checks we can perform and internal systems checks. We also verify it against what our investigation had showed to that point for which he provided information. And we began to figure out if there was something we could do with Mr. Davis to further investigations against the people he identified.

Q. What do you mean by something you could do with him?

A. Whether we could utilize that information or utilize Mr. Davis as a cooperating witness to make controlled purchases from those people.

Q. Did he become a cooperating witness?

A. Yes.

Q. What does that mean?

A. It means that essentially I will direct him to either approach certain people or provide certain information to me, and then with that information I'll decide if I want to direct him to conduct controlled purchases of drugs or firearms from those individuals.

Q. Whose decision was it to -- for the FBI to work with him?

A. Ultimately, at the first level, it was my decision. Once I've decided that he's somebody that we should consider working with, that goes through my boss and my boss's boss before it's finally approved.

Q.   So what did you consider in making that decision?

A.   We consider all the circumstances.  One of the primary considerations is his criminal history and his criminal past. And then we have to figure out if that criminal history precludes him from working with us.

Additionally, we have to look at what he can provide and if that is worthwhile in providing him the opportunity to work with us based on the information he can give us.

Q.   What did you require of him?

A.   First and foremost, the most primary requirement is that he always tells the truth.  We need to be able to know that every time he gives us information, it's to the best of his ability and truthfulness.

Additionally, I required him to stay out of trouble. Not break the law.  One of the rules we have is that he can no longer be involved in the criminal element except at our direction.

Q.   And what were you going to ask him to do?

A.   I was going to ask him to identify criminals involved in drug trafficking and weapons trafficking and weapons possession, and then ultimately to garner favor with them to the point where he could make purchases of either weapons or drugs from them.

Q.   And did he have to make any further promise to you in order to be able to make those controlled purchases?

A.   Yes.

Q.   What was that?

A.   He had to promise to do exactly as I told and only do the controlled purchases under my direction.

Q.   Now, what did you tell him specifically?  What did you tell Davis about this?

A.   I told him that he would be working with us in that capacity.  And I told him that should he continue to work and be truthful and productive that we would hold off on filing criminal charges based on the evidence that was recovered during the search warrant at his house.

Q.   And did you say that to Mr. Davis?

A.   Yes.

Q.   Now, what would happen if you found him to be untruthful?

A.   He would be charged with the criminal offenses associated with what we recovered in the search warrant.

Q.   And if that were the case, would he remain open as a source --

A.   No.

Q.   -- to the FBI?

Is he open right now?

A.   He is.

Q.   Now, in addition to -- did you explain that to Davis?

A.   I've explained that to him several times.

Q.   In addition to not being charged in this case, did the FBI

provide any other benefits to him?

A.    Yes.

Q.    What were those?

A.    Over the course of his cooperation with us, we provided him not only with essentially his freedom, we've also paid him incrementally over the course of the cooperation.  We also, at the end of this particular investigation, paid him what we term a relocation payment so that he could leave the area to ensure his safety.

Q.    Okay.  Why did you pay him during the course of the investigation?

A.    We had tasked Davis with quite a bit, so much so that he couldn't have gainful employment outside of working with us.  So the more he worked, the more that we would pay him.  And if he wasn't working, he wouldn't be getting paid by us.

Q.    And you mentioned a relocation benefit?

A.    Yes.

Q.    What is that?

A.    At the end of the case, if we see that there could be a safety risk associated with the work that he's provided, we calculate travel, three months of rent, security deposit, and some meals and expense money and provide it to him so that he can leave the area and begin a new life in another location where the safety risk is mitigated.

Q.    Why do you need him to leave the area?

A.    Because his safety would be in jeopardy if he remained in the area.

Q.    Do you know how much money he's received from the FBI?

A.    I don't recall the exact amount, but it's north of $50,000.

Q.    Does that include the relocation benefit?

A.    Yes.

Q.    And how much was that?

A.    That was approximately $19,000.

Q.    Have you provided any other benefits to him in addition to not charging and the relocation benefit and the other payment?

A.    No.

Q.    How about to any other member of his family?

A.    At one point one of the mothers of his children faced a threat based on his cooperation.

Q.    I'm going to move on to a different question.

        MR. MORAN:  May I have a moment, Your Honor?

        (Attorneys confer.)

BY MR. MORAN:

Q.    So did you provide a benefit to his son with regard to a probation matter?

A.    Yes, we did.  His son, who was approximately 16 years old at the time of the relocation, was on juvenile probation in Massachusetts, and he had several additional months of probation to serve.  In order to facilitate allowing his son to

also relocate, we asked the probation department if they would be able to assist in shortening the probation term.

Q.   So how many months were shortened?

A.   Approximately three.

Q.   Why was it necessary for the son to go with Davis when he was relocated?

A.   There was reason to believe that his son could also have his safety in jeopardy based on his father's cooperation. Additionally, it was a 16-year-old who wanted to relocate with his father.

Q.   So when did Davis become an active cooperator?

A.   That was in the spring of 2018.

Q.   And you testified he was involved in the -- was the cooperating witness in the investigation of Mr. Mallory.  Was he involved in controlled buys from other targets, as well?

A.   Yeah.

Q.   Okay.  Is he active now?

A.   Yes.

Q.   Has he been active the whole time, since spring of 2018?

A.   For the most part, yes.

Q.   Was he closed for a short period?

A.   Just a short period, yes.

Q.   Why was that?

A.   That was following his relocation when he was in another part of the country and we couldn't work with him at that

point.

Q. When you say "we," do you mean --

A. I mean myself.

Q. Okay. So was he closed for cause?

A. No.

Q. Did he actually -- was he reopened?

A. Yes.

Q. When was he reopened?

A. He was reopened within a month of the relocation.

Q. By whom?

A. I introduced him to an agent who works out of our Los Angeles field office, and that agent in LA opened him as a source.

Q. Are you aware whether there's been any misdeeds by Davis during this period?

A. I am.

Q. What?

A. Following the relocation, I'm aware that he was arrested by, I believe, the California State Highway Patrol. He was in a motor vehicle. The motor vehicle was stopped, and they found a small amount of heroin either on his person or in the car.

Q. Okay. Was he cited for that?

A. He was.

Q. Do you know what happened to the case in California?

A. My understanding is that it was dismissed.

Q. Do you know how that happened?

A. I don't.

Q. Okay. What did you do about that?

A. I have a requirement to report that to the Assistant United States Attorney, so I did that. I also reported to my supervisor and filed some paperwork to document what happened.

Q. Do you know whether the FBI in LA did anything with it?

A. They would have been under the same requirements, to document it and inform their supervisor and any Assistant United States Attorney attached to the case.

Q. Do you know whether any agent in LA spoke to the prosecutor about it?

A. I don't.

Q. So Davis was in LA. Is he still in LA, as far as you know?

A. He is not.

Q. Where is he generally now?

A. He is in the general Massachusetts area.

Q. Okay. The FBI provided money for him to move from Massachusetts to California. Did the FBI provide any benefit in order to get him back?

A. No.

Q. So how did he move back?

A. My understanding is that he drove his vehicle back. I was unaware that he was back until I called him one day, asked him

how things were going, and he said that he was back in the Massachusetts area.

Q. So is that how it -- he is working for you now?

A. Yes.

Q. So knowing all that about a cooperating witness, what sorts of procedures did you use in this case?

A. We used procedures that we use whenever we're working with a cooperating witness; that is, to verify the best we can anything, any information that he gives us. If he gives us a phone number, we track it down as best we can. If he gives us the name of somebody, we try to verify that as much as we can. And if he gives us the criminal conduct of somebody, we try to verify that as best we can.

Additionally, whenever we do controlled purchases, there's additional safeguards. One, he's searched before and after the controlled purchase.

Q. What do you mean by a "controlled purchase"?

A. So a controlled purchases is essentially a drug buy. It's somebody buying drugs. The reason we call it a controlled purchase is because we're on the other end trying to control the situation. So to achieve that, the cooperating witness is searched before. We want to make sure he's free of any drugs, obviously, any weapons, and any money.

We then provide him with a transmitter, which is a device which broadcasts live so that I can watch and listen to

what's going on during the transaction.

We provide him with audio-video recording devices which will audio and video record what's going on when he's conducting the transaction.

We conduct surveillance of Davis in this case, or the cooperating witness, from where we meet with him and do that search to the transaction, and from the transaction back to where we've told him to meet us afterwards.

Prior to sending him on the transaction, I specifically direct him as to what I want him to do, who I want him to deal with, what I want him to buy. We provide him with a certain amount of money for which he signs a receipt. And following the controlled purchase, we surveil him back to the location that we told him to go to. We search him to make sure that he doesn't have any additional drugs, any additional money, or any other contraband or weapons.

He provides us with the drugs that he's purchased or any additional money that wasn't spent on the drugs, if he's given a lower price when he does the transaction. And he provides us with the transmitter and audio-video recording devices. I can then review the audio-video recording, and I can match up what I see in the audio-video recording with what he tells me in a post-buy interview.

Q.   Now, why do you do all that?

A.   To control it.  To control the situation.  We want to

verify everything that he is telling us is true.

Q. How many recorders did you give him?

A. In this particular controlled purchase?

Q. Yes.

A. We gave him a transmitter and two audio-video recording devices.

Q. Why were there two audio-video recorders?

A. Speaking generally, we'll often give two in case one fails, if the batteries die or for some other reason it just doesn't work. In this particular case, we were unsure if the transaction would occur in a motor vehicle or outside the motor vehicle, so we had one recorder that was affixed to a motor vehicle and one recorder that Davis could carry on his person.

Q. Why is it important to get video or audio-video?

A. One, to collect evidence of the procedure of what happened. And two, so I can verify what he has told me has happened.

Q. Are you familiar with the defendant here?

A. Yes.

Q. When did you first encounter the defendant? When did you first know of him?

MR. TZENG: Judge, I'm not exactly sure where Mr. Moran is going with this, but it may be objectionable content.

THE COURT: Well, until we have an objectionable

question, I will not rule.

A.    As it relates to the investigation, Davis provided me information about Mr. Mallory in early July 2018.

MR. TZENG:  Objection, Judge.  It calls for hearsay.

THE COURT:  Well, not yet.  He just is telling us the general subject.

BY MR. MORAN:

Q.    So you say he's identified to you by Davis?

A.    Correct.

Q.    What instructions had you given Davis?

A.    In the investigation generally?

Q.    Yes.

A.    I had told him to attempt to make contact with, get to know, identify, and provide information on individuals involved in drug trafficking and weapons trafficking in the Brockton area.

Q.    So when you received information regarding the defendant from Davis, what did you do with that information?

A.    I tried to verify what he told me.  He had given us information about where he met with him, and we tried to verify that's somewhere where he might have been.  And we did records check to further identify who Mr. Mallory was.

Q.    At that time did you know the defendant's name?

A.    At that time I believe Davis had just provided a nickname. But with that nickname and working with Mr. Davis, we were able

to identify his full name.

Q. What was the nickname?

A. Parod.

Q. P-a-r-o-d?

A. I've seen it spelled that way and several others.

Q. What other ways?

A. P-i-r-a-u-d, P-i-r-r-o-d.

Q. P-a-r-r-o-d?

A. Yes.

Q. Did you learn the defendant's true name?

A. Yes.

Q. What was that?

A. Allah Mallory.

Q. And did you become familiar with his appearance?

A. Yes.

Q. How?

A. I viewed a Massachusetts Registry of Motor Vehicles photograph.

Q. Do you see the defendant in the courtroom?

A. I do.

Q. Would you identify him and pick out a piece of his clothing?

A. He's wearing a gray sweater, and he has glasses on the top of his head.

MR. MORAN: Your Honor, may the record reflect that

Agent Kenny has identified the defendant.

THE COURT: Yes.

BY MR. MORAN:

Q. Now, I would like you to turn to Exhibit 14. May we have the -- just for the witness, Your Honor, and counsel for the --

THE CLERK: Yes.

Q. Do you recognize that photograph?

A. I do.

Q. Who is in that photograph?

A. That is Mr. Mallory.

Q. Do you know when that picture was taken?

A. I believe it was taken in August 2018.

MR. MORAN: Your Honor, I offer Exhibit 14.

MR. TZENG: I object.

THE COURT: What's the purpose of this?

MR. MORAN: So that the jury has a picture of the defendant from around the immediate time of the controlled buy.

MR. TZENG: I object.

THE COURT: We'll mark it for identification for the moment.

(Government Exhibit 14 marked for identification.)

Q. Is it -- so you just testified that -- how you had identified -- you received information about the defendant and you had identified him. What did you do next with that information?

A.   I have to decide if he's somebody that we want to target in the investigation.  So I used the information gathered from the cooperating witness and from what other law enforcement officers, Brockton police officers, Massachusetts State Police from the Brockton area, and I decide if Mr. Mallory is somebody we will target with the cooperating witness in this case.

Q.   Did you make that decision?

A.   Yes.

Q.   And what was the decision?

A.   To target Mr. Mallory.

Q.   How?

A.   I instructed the cooperating witness to set up a drug buy, to ask Mr. Mallory to sell him drugs.

Q.   About when did you instruct Davis to do that?

A.   If he provided the information in the first couple of days of July, it would have been around July 5th.

Q.   Do you know whether Davis attempted to make contact?

A.   He did.

Q.   How do you know that?

A.   Initially on July 5th we met with Mr. Davis and placed a phone call to Mr. Mallory.  The phone call was unanswered, but we recorded the phone call to keep it for our records.

Q.   After that call did not go through, did you give any other instructions to Davis?

A.   Just to continue to try to reach out to Mr. Mallory and

try to set up a drug buy.

Q.   How did Davis have a phone number?

A.   When he initially provided the information about Mr. Mallory, Davis stated that he ran into him on a main street in Brockton and exchanged phone numbers with him.

MR. TZENG:  Objection, Judge.  That's hearsay.

THE COURT:  He's told us.

Q.   So were you ever able to do a controlled buy from the defendant?

A.   Yes.

Q.   How was that set up?

A.   Following the unanswered call on the 5th, I had instructed Davis to continue to attempt to call --

THE COURT:  Sorry.  Which month are we talking about now?

THE WITNESS:  This is July, Your Honor.  I apologize.

A.   On July 5th was the unanswered call.  On July 7th or July 8th, Davis was able to make contact with Mr. Mallory and set up a buy which ultimately we attempted on July 9th.

Q.   How do you know that Davis made contact?

A.   As soon as he did, he reached out to me to let me know.

MR. MORAN:  May we have Exhibits 5.1 and 5.2 just for the witness.

BY MR. MORAN:

Q.   Do you see Exhibits 5 .1 and 5.2?

A.   Yes.

Q.   What are those?

A.   Those are screenshots of my cell phone that display text messages between myself and Davis.

Q.   Who took those screenshots?

A.   I did.

Q.   And the writing that is on the right, is that green?

A.   Yes.

Q.   Greenish?

A.   Yes.

Q.   Is that your writing or what you typed?

A.   Those would be the text messages that I sent to him.

Q.   Are those accurate?

A.   Yes.

Q.   And the ones on the left with a "C," who sent those?

A.   Those were sent by Davis.

Q.   And what does the "C" stand for?

A.   I had him saved in my phone as "Chef," his code name.

Q.   And the dates that are on Exhibits 5.1 and 5.2, are those accurate?

A.   Yes.

Q.   And where it says, for example, Sunday, July 8th, is that the text messages that are above or below that date?

A.   They would be the text messages that follow below that date.

Q. So are those accurate copies of the messages that you saw and sent?

A. Yes.

Q. Let's turn to July 9th, 2018. What happened on July 9th?

A. Ultimately what happened was we conducted a controlled purchase of drugs from Mr. Mallory.

Q. Okay. With regard to that controlled purchase, what happened first?

A. First we met with -- I'm sorry.

First I contacted Davis in the morning and asked him to basically ensure that the drug buy would happen.

Q. Why did you do that?

A. Candidly, we were traveling from Chelsea at the time to Brockton and didn't want to travel all the way down if it wasn't going to happen.

Q. Are you aware whether Davis made contact with the defendant?

A. Yes.

Q. Were you present for that contact?

A. That first contact I was not present for.

Q. Did you hear from Davis after that contact?

A. Yes.

Q. And as a result of hearing from Davis, what did you do?

A. I told Davis that we would meet him at a certain time at a certain location in Brockton to prepare for the controlled

purchase.

Q. So when did you meet with him on July 9th?

A. Approximately 3:00 p.m.

Q. Without stating specifically, where did you meet him?

A. Basically in the area of a shopping center in Brockton.

Q. Is that location intended to remain a secret?

A. We still use it sometimes to meet, yes.

Q. Who was present?

A. Myself, Davis, Task Force Officer Patrick O'Brien, members of the state police who work with us, and members of the Brockton Police that work with us, any members of the Boston Police who work with us.

THE COURT: How many of you were there?

THE WITNESS: I believe there were six of us.

BY MR. MORAN:

Q. What happened when you all got together?

A. Initially, as far as the law enforcement officers go, we discuss what the event will be, what we're trying to do, and what role we want everybody to play as far as whether or not they're going to be involved in the search, surveillance, recovering, and seizing the drugs. And then, as it relates to Davis, we conducted a call to Mr. Mallory to firm up a time and a location for the controlled purchase.

Q. Did he make that call?

A. He did.

Q.   How do you know he made that call?

A.   I was present and I recorded it.

Q.   Okay.  Who did he call?

A.   He called Mr. Mallory.

Q.   What did you instruct him to do after the call?  What did you do after the call?

A.   After the call, I end the recording, and then we eventually made a second call.

Q.   How many calls did you -- did he end up making?

A.   Davis made two calls to Mallory, he sent a text message to Mallory, and he received a call from Mallory.

Q.   What happened to those communications, the calls first?

A.   The calls were all recorded.  I downloaded them to a disk and saved them.

MR. MORAN:  Just for the witness, may we have Exhibits 6.1 and 6.2.  Actually, it's all one Exhibit 6, Your Honor.

THE COURT:  You are offering it?

BY MR. MORAN:

Q.   Do you see Exhibit 6?

A.   I do.

Q.   What is it?

A.   Those are photographs that I took of Davis's cell phone.  Specifically they show the contacts between Davis and who he has saved as Parrodd, P-a-r-r-o-d-d.

Q.   And are those -- were you present for those calls?

A.   I was present for all of the calls except the call that's reflected as today, 12:27 p.m.

Q.   And that was the one that he called you about after?

A.   Correct.

Q.   And you took those pictures of Davis's cell?

A.   Yes.

MR. MORAN:  Your Honor, I offer Exhibit 6.

MR. TZENG:  No objection.

THE COURT:  Okay.

(Government Exhibit 6 received in evidence.)

MR. MORAN:  May they be published to the jury.

THE CLERK:  I just did.  Do you see those up on your screen?

THE COURT:  Those in the back row, you have a little cabinet next to you.  Open that up and then pull out the screen.  Not everybody has it but most of you do.  There you go.  Are they all working?

THE CLERK:  No.  Why would they be?

THE COURT:  Are any of them working?

THE CLERK:  No.

THE COURT:  None of them are working?

THE CLERK:  No.

MR. TZENG:  Is there a button on top of the screen?

THE CLERK:  Yes, I just had them do that.

THE COURT:  We've been having really serious problems

with our screens and videos, and the last trial was totally botched up as a result. Tell us when you see a picture. Coming up?

We might as well stretch while we wait.

(Stretch break.)

MR. MORAN: Your Honor, I can probably keep going if I can have a little latitude to have him testify about the document, and it will be in evidence for the jury to look at during deliberations.

THE COURT: Maybe. There may be evidence that they may not be able to look at, at least not that way.

Is somebody coming?

THE CLERK: Yes.

THE COURT: Why don't you proceed as best you can.

MR. MORAN: Thank you, Your Honor.

BY MR. MORAN:

Q. Agent Kenny, if your screen is not working, there's also a binder immediately in front of you which has --

THE COURT: There's something on over there. Is that what you want to show?

MR. MORAN: It is. I can't see what that actually shows. I will attempt to lay a foundation.

THE COURT: Well, I confess that although I can see a picture and I can see a screen, it doesn't make much sense to me either. I mean, either one -- I don't know what either one

of them is.

BY MR. MORAN:

Q.   Well, Agent Kenny, what is in the document, Exhibit 6?

A.   It's a photograph I took of Davis's cell phone that shows the call history and a cell phone message with --

THE COURT:  You mean it's a picture of the screen of the cell phone?

THE WITNESS:  Correct.  It has a number of fingerprints and glare which makes it difficult to make out.

BY MR. MORAN:

Q.   Of whose cell phone?

A.   Davis.

Q.   And how did you take the picture?

A.   I used my work-issued cell phone.

Q.   So, according to this document, there was an outgoing call from Davis's cell phone at 12:27 p.m.; is that correct?

A.   That is correct.

Q.   And then another outgoing call at 3:31 p.m., correct?

A.   Correct.

Q.   And then another at 3:52 p.m., correct?

A.   Correct.

Q.   And were those two recorded?

THE COURT:  Now it just went out.

THE CLERK:  No, that's me, Judge.  Sorry.  I'm trying to fix it.

THE COURT: Oh, okay.

A. The 3:31 p.m. call and the 3:52 p.m. call were each recorded.

Q. And at 4:37 p.m. Davis's phone sent a text message, correct?

A. Correct.

Q. What did that text message say?

A. "You close?"

Q. And then at 4:37 there was another incoming call, correct?

A. Correct.

Q. From what phone?

A. That would be a call from the Parod phone, Mr. Mallory, to Davis.

Q. Was that call recorded?

A. It was.

Q. And then at 4:51 p.m. there was another outgoing call from Davis's phone, correct?

A. Correct.

Q. To whose phone?

A. To Mr. Mallory.

Q. Was that recorded in any way?

A. No.

Q. Did you hear at least Davis's portion of that call?

A. Yes. At that point the controlled purchase had begun. And I was listening over the transmitter and could hear that

call.

Q.    So you could hear Davis's part of the call on the recording?

A.    Yes.

Q.    So moving on, the last call that you recorded was at 4:37, correct?

A.    Correct.

Q.    What happened after that?

A.    Following that call we now knew the location and the time to meet with Mr. Mallory, so we began to go through those safeguards that I described before a controlled purchase.  Task Force Officer O'Brien searched Davis, both his person and the vehicle he'd be traveling in, for drugs, weapons, contraband, and money.  That was in my presence, and he didn't have any of those items.

We then provided Davis with $200 of official agency funds, which is basically $200 that I've drawn from to use for this purpose.  I provided him with a transmitter, two audio-video recording devices.  I gave one to him personally, and I affixed one to his vehicle.  And then I directed him to travel to Milton Street to meet with Mr. Mallory and purchase $100 worth of heroin and $100 worth of crack cocaine.

Q.    Why did you tell him to purchase $100 worth each?

A.    For a number of reasons.  This was the first purchase from Mr. Mallory.

THE COURT: Excuse me one second. I think we'd better just stop for a moment.

MR. MORAN: Your Honor, I can get by without the monitors.

THE COURT: I know, but the jury is being distracted.

MR. MORAN: I might suggest that we attempt to fix the monitors perhaps after the testimony.

THE COURT: I would like to have him diagnose the problem right now because he may be able to fix it instantly.

MR. DOREAU: There's a switch I need to turn on and off in the floor right here. It's on, but it's only going to one or, maybe, two monitors. I think if I turn that off and on.

THE CLERK: Can you do that?

MR. DOREAU: I can do that as soon as those people move.

(Pause for technical difficulty.)

THE COURT: Thank you for being so accommodating.

Mr. Moran, you may continue.

I guess we now have a picture on all of the screens, yes?

Lisa, can we make it so the picture is on the screens? Don't go away yet.

THE CLERK: No, it's not.

THE JUROR: There's three more here.

THE COURT:  No picture?

MR. DOREAU:  It's on four in the front and one in the back right now.

THE COURT:  Well, I think we'll continue, and then at 1:00 we'll be out of here and you can --

MR. DOREAU:  I'll be right back.

THE COURT:  Thank you.

MR. MORAN:  Thank you, Your Honor.

THE COURT:  Sorry about that.

BY MR. MORAN:

Q.   When we paused for a moment, I had asked you why you instructed him to purchase $100 each of heroin and crack cocaine?

A.   Yes.  There's a couple considerations.  In my experience, especially in the first transaction with a new target, you don't want to ask for too much that they can't make.  So we tend to ask on the lower side.

Additionally, as a case agent, I'm in charge of making sure that the money that we're allotted lasts for the investigation.  So when we're able to buy smaller amounts, rather than larger amounts, we tend to buy the smaller amounts so that we can conduct more controlled purchases.

Q.   Now, you mentioned recorders.  Generally, where were they?

A.   One was affixed within the motor vehicle, and the second was something that was on Davis's person.

Q. When you say on his person, was it affixed to his person or carried?

A. Carried.

Q. Did you check the recorders before you used them?

A. Yes.

Q. And did you -- were they working?

A. Yes.

Q. Who operated the recorders?

A. I did.

Q. What does that mean?

A. That means in addition to making sure they're functional, I placed them in the spots where I wanted them, and I activated them, turned them on.

Q. You mentioned you sent out surveillance. Why did you do that?

A. For a couple of reasons. One, we want to make sure that Davis is safe, the cooperating witness is safe throughout the transaction. We want to have surveillance units in place where if something goes wrong they are able to quickly respond to.

THE COURT: Can you explain to us, please, what you mean by "surveillance" in this context?

THE WITNESS: Yes, Your Honor.

Surveillance is essentially trying to make observations of the transaction as it's taking place. In this case, officers would go into the area of Milton Street and try

to get into locations where they'd be able to observe either the cooperating witness, Mr. Mallory, the transaction happen or all of the above.

BY MR. MORAN:

Q. Did surveillance leave before you did?

A. Yes.

Q. Where did you send them?

A. To the area of Milton Street and North Warren Avenue.

Q. Are you familiar with that area?

A. Yes.

Q. What city?

A. Brockton.

Q. Are you familiar with how it looked in July 2018?

A. Yes.

Q. Would you --

MR. MORAN: May I approach, Your Honor?

THE COURT: Yes.

MR. MORAN: Your Honor, we have a map of that area of Brockton marked as Exhibit -- as a chalk, A for ID, and I thought there might be a problem with the computer so I had it blown up. So if I may, Your Honor. I don't know if this will be any better.

BY MR. MORAN:

Q. But, Agent, can you see this, what's been marked as A?

A. Yes. I also have it on my screen.

THE COURT: Excuse me. Jurors have no screens working. You know, I'm not sure that they can see very much at this distance. It may be necessary for the witness to come down and explain it to the jury, but it's up to you.

MR. MORAN: I think a very general demonstration from here might be sufficient.

BY MR. MORAN:

Q. Is this an accurate depiction of North Warren and Milton Street in Brockton?

A. Yes.

Q. Would you indicate on the map and generally describe -- you said you sent surveillance, and then what did you do?

A. Following the surveillance officers leaving, I activated one of the two recording devices; then I directed Davis to travel to the area of Milton Street to meet with Mr. Mallory and purchase the drugs.

Q. And where did Davis go?

A. Davis left where we met him. Myself and Task Force Officer O'Brien maintained surveillance. We were just a car behind him as he traveled that area. Then he got onto Prospect Street, which is where this map picks up, and then took a left onto Milton Street.

Q. So would you point out where North Warren Avenue is.

A. Right in the middle of the diagram.

Q. And where is Milton Street?

A.   Milton Street runs in sort of an L shape off of North Warren and Prospect (indicating).

Q.   So, again, with your finger, can you just indicate where Davis drove?

A.   So he came coming off the map.  He ended up coming up Prospect, took a left on Milton.

Q.   And then where did he stop?

A.   So we followed him as far as here (indicating).  At this point we made a U-turn and he made the left turn, and I saw him stop right in the area of where it bends.

Q.   And do you know where the transaction took place?  You can return to your --

A.   The transaction took place at 210 North Warren Avenue, which is on the corner of Milton and North Warren, right in this area (indicating).

Q.   All right.  Would you -- if you'd return to your seat.  Would you check Exhibits 1.1, 1.2, and 1.3.  Do you see those pictures?

A.   Yes.

Q.   What are they?

A.   Those are images of 210 North Warren Avenue in Brockton.

Q.   Do they accurately depict what 210 North Warren looked like --

THE COURT:  Wait a minute.  Are the jurors able to see this?

MR. MORAN:  They're not in evidence yet, Your Honor.

Q.   Are you able to -- are 1.1, 1.2, and 1.3, do they accurately depict what 210 North Warren Avenue looked like in July 2018?

A.   Yes.

MR. MORAN:  Your Honor, I would offer them.

THE COURT:  No objection?

MR. TZENG:  No, Judge.

(Government Exhibits 1.1 to 1.3 received in evidence.)

THE COURT:  We can't.  The jury can't see them.  I think they may be able to see -- if I may have the overhead.

THE JUROR:  We have them now.

THE CLERK:  Oh, they're on.

THE COURT:  All of them are on now?

THE JUROR:  No.

MR. MORAN:  Your Honor, perhaps if I could just move this a little bit, angle it a little bit (referring to screen).

BY MR. MORAN:

Q.   What is Exhibit 1.1?

A.   That is 210 North Warren Avenue, and it's the view from if you were on North Warren Avenue.

THE COURT:  You know, Lisa, maybe we can --

THE CLERK:  I was just thinking I was going to turn this over here (indicating).

THE COURT:  This is another little one that we could

turn around.

THE CLERK:  Do you see that?

THE COURT:  I think you need to angle it a little more, the right corner.  There we go.

MR. MORAN:  May we have Exhibit 1.2.

BY MR. MORAN:

Q.  What view is this?

THE COURT:  Wait a minute.  You need to give her a chance to put it on.

THE CLERK:  No.  I'm good.

THE COURT:  Oh, you're doing it.  Oh, good.

MR. MORAN:  Ms. Fahey is doing it by Trial Directory, Your Honor.

A.  This is -- the house most to the right of this photograph is 210 North Warren Avenue, and it's taken at the corner of Milton Street and North Warren Avenue.

Q.  And you can see a person on the steps there?

A.  Yes.

Q.  Do you know who that is?

A.  No.

Q.  Is that anyone with any connection to this investigation?

A.  Not to my knowledge.

Q.  Okay.  And Exhibit 1.3.

A.  That is, again, 210 North Warren Avenue, and that would be the view from Milton Street.

Q. Do you know where these photographs came from?

A. I believe they came from Google Earth or Google Maps.

Q. So where were you during the transaction?

A. As I described, we were the car behind Davis as he drove down Prospect Street. When he took the left on Milton, we made a U-turn on Prospect, drove back to North Warren and took a right on North Warren. That took us by the North Warren side of 210 North Warren Avenue, and then we went to --

THE WITNESS: May I stand, Your Honor?

THE COURT: Yes.

A. There's a bakery with a large parking lot right here (indicating). There's 210 North Warren Avenue. We drove by it and waited in that area until the transaction was complete.

Q. Why didn't you just go to some place on Milton Street?

A. We didn't want to create an unsafe situation for Davis. We -- when we drove by, we saw that there were many people out and about. It was July, summertime, and we saw people on the porch area of 210 North Warren Ave., so we didn't want to be seen.

Q. So what did you do during the transaction?

A. I was the passenger in the vehicle. I was monitoring the transmitter so that I could both see and hear what was happening, and I was taking notes on any surveillance observations and any observations I made from the transmitter.

Q. Why were you monitoring the transaction over the

transmitter?

A. One, for Davis's safety, to make sure that nothing was going wrong. And, two, because I wanted to be able to make realtime observations of what was happening in the transaction and be able to verify Davis's story when I debriefed him following the transaction.

Q. So through your monitoring of the transmitter, do you know whether the personal recorder was always with Davis?

A. I do know. And it was not.

Q. How do you know that?

A. When we -- just about after we had passed 210 North Warren Avenue and were getting to the bakery parking lot, I had just seen Davis walking across Milton Street. And I could tell on the transmitter that the transmitter was still in Davis's vehicle.

Q. How do you know it was still in the vehicle?

A. I believe it was faced up. So the picture I was seeing was the roof of the vehicle.

Q. You said that you saw Davis walking across the street. Was he alone?

A. No. He appeared to be with a black male.

Q. Could you identify the person?

A. I couldn't any further than that.

Q. How long was the personal recorder in the car without Davis?

A. Approximately four minutes.

Q. What were you thinking during that time?

A. I was concerned for the integrity of the controlled purchase. I was concerned for the safety of Davis. And I was hoping he would come back and get it.

Q. Did that happen?

A. Yes.

Q. How do you know that?

A. Watching the transmitter, I saw Davis, and I also heard him say something to the effect of that he forgot the phone. And then following that I could see on the transmitter that he was now walking across Milton Street and into a basement.

Q. After that, were you still concerned or was that gone -- did that go away?

A. No, I was still concerned at that point.

Q. So you continued to listen to the transmitter, yes?

A. Yes.

Q. Once he retrieved the recorder, transmitter, how many voices did you hear?

A. Two.

Q. Was one of the voices Davis's?

A. Yes.

Q. How long was Davis away from the car the second time?

A. Approximately three or four minutes.

Q. Did Davis return to the car?

A.   Yes.

Q.   How do you know that?

A.   On the transmitter I could see that he was now exiting the basement.  I could see that he was in the daylight crossing the street, and I could see that he entered the vehicle.

Q.   What did you do?

A.   At that point I -- throughout the entire transaction I'm communicating with the surveillance officers, but I let them all know where that stood.  And we began to turn onto North Warren Ave.

Q.   And where was Davis as you began to turn on North Warren Avenue?

A.   As he made the turn from Milton Street onto North Warren Ave., we were making the exit from the bakery parking lot on North Warren Ave., so he was within eyesight of just a few cars ahead.

Q.   And you saw him as he got into the car and turned onto the street?

A.   Yes.

Q.   Where did he go?

A.   He went directly to where we had asked him to, to that meeting location at the shopping center.

Q.   And where did you go?

A.   We followed him there.

Q.   What happened when you got there?

A.   Once we got there, first I deactivated the audio-video recording devices.  I reacquired them from Davis.  I also acquired -- in this case, Task Force Officer O'Brien acquired the drugs, what we believed to be heroin and crack cocaine.  Davis provided a clear plastic bag of a brown powder substance and two clear plastic bags of an off-white rock-like substance to TFO O'Brien.

     "TFO" is task force officer.  I'm sorry.

Q.   Were you present when that happened?

A.   I was.

Q.   Had he had those things before the controlled buy?

A.   No.

Q.   Did you find anything else when you searched him or his person or his car?

A.   Task Force Officer O'Brien conducted the search of Davis and the vehicle, and I was present for that.  And there was nothing else recovered.

     MR. MORAN:  May I approach, Your Honor?

     THE COURT:  Yes.

BY MR. MORAN:

Q.   I'm handing you what's been marked as Exhibits 9 and 10.

A.   Yes.

Q.   Do you recognize those?

A.   I do.

Q.   Let's start with 9.  Do you recognize it?

A. Yes.

Q. What is it?

A. This is an FBI evidence bag, an evidence package. And the contents are the off-white rock-like substance from the two clear plastic bags that we recovered from Davis following the controlled purchase.

Q. Was that off-white substance consistent with anything in appearance?

A. Crack cocaine.

Q. Now, how did you label that bag?

A. I labeled it with -- we have evidence labels that we affix to the bags that include our field office abbreviation, the file number, the case number, the date that it was seized, and the date that I sealed the bag. And then there's a block for my name and my signature and a witness's name and his signature and also the weight of this entire package.

Q. And you said that you sealed it. How did you seal the bag?

A. Using a heat sealing device.

Q. What did you do with the bag after it was labeled and sealed?

A. First, I weigh it. And then myself and Task Force Officer Christopher St. Ives placed it into a safe at the Brockton office that we have.

Q. And then what did you do with regard to the bag?

A.   This bag?

Q.   Yes.

A.   It remained in the safe until July 11th, and then myself and Special Agent William McDermott transported it from Brockton to the FBI in Boston, which is actually in Chelsea, and entered it into the evidence control room.

Q.   At the time that you started and then checked it in, what was its condition?

A.   It was completely sealed.

Q.   Okay.  Now, is Exhibit 9 in the same condition now as it was when it was stored?

A.   It is not.

Q.   What's -- how is it different?

A.   It appears that the bottom has been cut off, and the bottom piece that was cut off is now contained within the bag. The bag is sealed again, but the contents now include what was cut off.

Q.   And has someone else written on the bag as well?

A.   Yes.

Q.   Turning to Exhibit 10, what is that?

A.   This is the brown powdered substance that was recovered from Davis following the controlled transaction.

Q.   What did you do with that substance after you recovered it from Davis?

A.   We placed it within this evidence bag, heat-sealed the

bag, and applied this evidence label.

Q. And what did you do with the bag after you labeled it and sealed it?

A. Following the labeling --

Q. Was it within Exhibit 9 the whole time?

A. Yes.

Q. Okay. And is Exhibit -- so it went with you to Chelsea and then was submitted?

A. The two were together at all times.

Q. Is the condition of Exhibit 10 the same now as when you sent it?

A. No.

Q. How is it different?

A. Just like Exhibit 9, it appears the bottom has been cut off, and that piece that was cut off is now within the bag. The bag is sealed again, but it contains that piece.

Q. How many times has it been cut off?

A. Exhibit 10, it's just once.

Q. How about Exhibit 9?

A. Exhibit 9 is twice.

THE COURT: Is this a good time to suspend until tomorrow?

MR. MORAN: Yes, it is, Your Honor.

THE COURT: Okay. Members of the Jury, we will now stop the trial until tomorrow morning at 9:00. I devoutly hope

that you will all be here at 9:00, and we will start promptly at 9:00. But if somebody is missing, we have to wait.

In the meantime, I ask you please not to think about the case. Certainly do not make up your minds about the case. You really are in no position to do that, having heard a piece of one witness's testimony only. Don't do any research about the case or drugs in general. Don't go to Google. Don't go to Amazon. Don't listen to the radio, television or anything. Just forget about the case until tomorrow morning at 9:00 when I ask you, please, to pay close attention.

Hopefully you will be able to see the video then, whatever. This is a terrible problem we've had. And we had lots of people working on it last week, and we were assured that it was now finally working, and here we are again. So I apologize. Hopefully we'll get it done without interruption. It is very difficult for counsel, both counsel, when this happens, and I know it's difficult for you, too. So sorry about that.

But you are now excused until 9:00 tomorrow morning. Leave your notebooks on your chairs, please. We will collect them, but we won't read them. And we will give them back to you tomorrow.

THE CLERK: All rise, please.

(The jury is not present for the following.)

THE COURT: Mr. Moran, where are we in relation to

where you thought we would be today?

MR. MORAN: With the -- I'm almost done with Agent Kenny. With the mixup it put me a little off my time. I'm going to finish with him with a little bit more. I don't know how long Mr. Tzeng will be with Agent Kenny.

THE COURT: He will do whatever his thing is.

Now, about the video that is still at issue, is there some time I can have a look at that?

MR. MORAN: We can watch it right now. It's being played on the trial laptop. We should just make sure the door is closed.

THE COURT: Okay.

We are going to have a quick look at the two minutes of the video, assuming we can do it.

MR. MORAN: Your Honor, we have it on Trial Directory. It should work. We were trying it this morning.

THE COURT: Go ahead. I don't know whether it's set up to do it.

MR. MORAN: For the record, this is what's been marked as Exhibit 7.1.

(Video playing.)

THE COURT: Is that it? Are we finished with it?

MR. TZENG: It's still going.

MR. MORAN: The whole thing is about three minutes.

(Video playing.)

THE COURT: Is that it?

MR. MORAN: That's it, Your Honor.

THE COURT: I do not understand why we need anybody to identify the defendant. There's a bunch of pictures, which is very clear who it is, and it's the same person throughout in very sort of episodic and upsidedown ways. But I don't see any reason to have to identify him other than the jury looking at this. There's no question that these two people are probably the same. So that's my ruling on that.

If any problems arise about anything, please let Ms. Urso know, and we'll meet at quarter of 9:00 tomorrow rather than letting the jury wait.

Thank you both.

MR. MORAN: Your Honor, Exhibit 14 you reserved on.

THE COURT: Which one is that?

MR. MORAN: That's the photograph.

THE COURT: Which photograph?

MR. MORAN: Of the defendant.

MR. TZENG: He's clearly wearing jail clothes. I mean, this is a very prejudicial photograph of Mister --

THE COURT: It doesn't look to me like jail clothes.

MR. TZENG: I mean, it's a concrete wall. It's a green outfit. I mean, I went through all this trouble to grab him some clothes so the jury wouldn't have to see him like this.

THE COURT: Why do we need this?

MR. MORAN: Because I think they're entitled to have a photograph of the defendant in there so they can make a comparison. This was taken about a month after the deal. It's closest in time.

THE COURT: I'll think about it. But I'll see you tomorrow morning at 9:00 or quarter of 9:00 if you seek to have any discussion about any of this. Thank you.

MR. MORAN: Your Honor, the one thing I think -- as Your Honor noted, the video is my case. I'll ask Ms. Fahey to work with the court staff to make sure this is working.

THE COURT: I think it's a very good idea.

MR. MORAN: I'll need some latitude to make some other arrangements.

THE COURT: We had major repairs, I thought, last week. We were guaranteed that it's fine, and here we are. So we're hoping. But whatever you can do to assist, by all means, do it.

MR. MORAN: Your Honor, may Agent Kenny maintain custody of the drugs?

THE COURT: I assume there's no objection.

MR. TZENG: Better him than me.

(Adjourned, 1:10 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Linda Walsh, Registered Professional Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter, to the best of my skill and ability.

Dated this 30th day of July, 2020.


/s/ Linda Walsh
Linda Walsh, RPR, CRR
Official Court Reporter